Syllabus.

JOSEPH T. JONES ET AL. *v.* WILLIAM O. ROGERS ET AL.

1. CLOUDS ON TITLE. *Equity. Code* 1892, § 500.

The complainant in an equity suit to cancel clouds upon title to real estate, under Code 1892, § 500, providing for such suits in the chancery court, must show a perfect legal or a perfect equitable title in himself, independently of defects in the defendant's title.

2. LANDS. *Description. Vicinity.*

Lands in the vicinity of a state are not in, but outside of, the state, although near it.

3. SAME. *United States marshal. Execution. Return.*

The return of a United States marshal on an execution to the effect that he had levied upon and sold lands, without designating in any way in what state or county they were situate, but showing that they were in the vicinity of the state including his district, is utterly void.

4. SAME. *Execution sales. Place. Act of congress, approved May 19, 1828. Revised Statutes of the United States, sec.* 914.

United States marshals in making sales of land under execution, as a general rule, are required by law (Act of Congress, approved May 19, 1828; Revised Statutes of the United States, sec. 914) to conform to the laws of the state governing the subject of such sales, and they must be made at the place provided by the law of the state for sheriffs' sales of land under execution.

5. SAME. *Exception. Act of congress, approved February* 16, 1838.

The exception to the general rule (Act of Congress, February 16, 1838) allowing marshal's sales of land in Mississippi to be made, upon the written request of the defendant, etc., at the place where the United States court for the district was holden, does not give validity to a marshal's sale not made at the courthouse door of the county in which the land lies, but "at Jackson," where the United States court was held, in the absence of the written request of the defendant, and its existence will not be presumed.

6. SAME. *Meaning of word "place" in the act.*

The word "place" in the statute (Act of Congress, approved February 16, 1838) authorizing marshal's sales of land under execution,.

in Mississippi, to be made, upon written request of defendant, "at the *place* where the United States court for the district is holden," does not mean any place in the town or city where the court was held, but means the particular house in which the court held its sittings.

7. SAME. *Marshal's return. Presumption.*

Where a marshal made return of two sales, each of a different tract of land, under the same execution, in respect to one of which he set out with particularity the written request of the defendant that the lands first sold should be sold at the place where the United States court was held, and all the facts of the first sale, but in respect to the second sale he made no mention of a written request by defendant that the lands sold thereat should be sold at such place, the presumption is that no such written request was made.

8. SAME. *Statutes fixing place of sales. Mandatory.*

Statutes fixing the place for the sale of lands under execution are mandatory, and a sale made contrary to such a statute is void.

9. EXECUTION SALE. *Officer's return.*

The return of an officer on an execution showing the sale of land thereunder to a designated person does not transfer the title; it only gives the purchaser the right to demand a deed conveying the title.

10. SAME. *Absence of deed. Presumption.*

In a suit to confirm titles to real estate and to cancel clouds, where the complainant claims under a purchaser at an execution sale, in the absence of a showing that such purchaser's bid was consummated by a deed, it will he presumed after the lapse of many years that he transferred his bid or did some act renouncing it.

11. SAME. *Destruction of records.*

Under the allegations of a bill to remove clouds from title that the marshal made execution sale of the land to complainants' ancestor, and that the land records of the county were destroyed, it cannot be presumed that the marshal executed a deed to the purchaser, and that it was recorded.

12. SAME. "*Seized and possessed.*"

The allegation of the bill to remove clouds from title that complainants' ancestor, under the execution sale to whom they claim, was at the time of his death seized and possessed in fee simple of the lands, is merely a legal conclusion, and a statement of constructive possession, not of actual possession.

13. SAME.   "*Yielded up possession.*"

The allegation of the bill to remove clouds from title, complain-
ants claiming under an execution sale, that defendant in execu-
tion "yielded up possession" of the lands "after" the sale, is
insufficient to show to whom or when possession was yielded, or
that the purchaser, or any one claiming under him, ever had
actual possession.

14. SAME.   *Possession under sale.*

A deed to the purchaser at execution sale will not be presumed in
the absence of a showing that he went into posesssion under the
sale and continued in possession.

15. SAME.   *Statute of limitations.   Suit in equity.   Code 1892, § 2731.*

Under Code 1892, § 2731, providing that a person claiming land in
equity may not bring suit to recover the same but within the
period during which he might have brought an action at law, a
suit for the recovery of land, concealed frauds excepted, is
barred in ten years after the complainant's right of action ac-
crued, without regard to whether defendant has or has not been
in the adverse possession of the land.

16. SAME.   *Concealed fraud.*

In order to bring a case within the exception to Code 1892, § 2731,
providing that in every case of concealed fraud the right of a
person to bring suit in equity for land, of which he may have
been deprived by such fraud, shall be deemed to have first ac-
crued at, and not before, the time at which the fraud shall or,
with reasonable diligence, might have been first known or dis-
covered, it is necessary for the complainant to aver and prove:

(*a*) The acts or facts constituting the fraud;

(*b*) That the acts or facts constituting the fraud were committed
by defendant or some one in privity with him;

(*c*) That the acts or facts constituting the fraud were concealed
from complainant by defendant or some one in privity with him;

(*d*) That complainant did not discover or know of the fraud more
than ten years before beginning his suit; and

(*e*) That complainant exercised reasonable diligence to discover
the fraud sooner, or that he could not, with reasonable diligence,
have discovered it sooner.

17. SAME.   *Chancery pleadings.   Fraud.*

A bill in equity for lands will not escape a demurrer setting up
the statute of limitations on the ground of a concealed fraud

unless the facts of which the charge of fraud is predicated be specifically pleaded and the acts which are charged to have been fraudulent clearly set out.

FROM the chancery court of Harrison county.

HON. STONE DEAVOURS, Chancellor.

Rogers and others, appellees, were complainants in the court below; Jones and others, appellants, were defendants there. From a decree overruling demurrers to the bill of complaint the defendants appealed to the supreme court. The facts are fully stated in the opinion of the court.

[For the decision of a motion in the case, see *Harrison County* v. *Rogers, ante.* 578.]

*Ford & White, Bowers, Neville & Griffith,* and *W. G. Evans, Jr.,* for appellants.

The whole case of appellees, as exhibited in this bill, rests upon the assumption that the alleged sale by the United States marshal at Jackson on October 28, 1839, vested in complainants either the entire legal and equitable title or such an equitable title as would enable complainants to maintain a bill to divest the legal title out of the person now holding same and vest it in complainants, and incidental thereto obtain such other relief as might be necessary to render a decree on the merits of this contention effective.

The court will observe that there is no allegation in this bill that any United States marshal ever executed or delivered to complainants' ancestor a deed conveying, or purporting to convey, this or any other land, but simply that a sale was made by such marshal on October 28, 1839, and that John Martin became the purchaser, and that he, Martin, paid the bid. They allege no facts, such as the execution of a conveyance by the marshal pursuant to a sale under an execution, so as to raise the presumption that in truth and in fact a levy and sale had been made pursuant to law, but, on the contrary, stand upon this so-called marshal's return to establish said facts, other than the allegation of the payment of the bid, and then invoke the

rule that the court will presume the execution and delivery of a deed from the facts established. by this return as shown in the exhibit to the bill. This so-called return is not signed by any person claiming or assuming to act as a United States marshal, nor by any person styling himself as the deputy or properly authorized agent of such officer. It is signed simply "Wm. M. Gwin, Marshal, per F. S. Hunt." Now, who F. S. Hunt was, nowhere appears in this record. Whether he was a deputy marshal or one of those convenient personages who do what is commonly called the "heavy standing around," is wholly unexplained, and we insist that his signature of the name of the United States marshal to this document is insufficient to elevate this so-called return to the dignity of an official "certificate" or "attestation" so as to bring it within the purview of sec. 1796 of the code.

If we are mistaken in the position that this so-called return on this exhibit is not *prima facie* evidence of the performance of the acts therein referred to by a United States marshal, then we insist that, treating it as a return of such officer and taking all the facts stated to be true, these facts show a disregard of a plain statute and render a sale as recited utterly void.

Statutes fixing the time and place of sales by sheriffs under execution are mandatory, and a sale made at a time or place other than that fixed by law is void. *Koch* v. *Bridges,* 45 Miss., 257; *Loudermilk* v. *Corpening,* 101 N. C., 640; *Moody's Heirs* v. *Moeller* (Tex.), 13 Am. St. Rep., 839. It appears in the report of *Moody Heirs* v. *Moeller, supra,* that a sale was made by a United States marshal, under an execution at law, in the city of San Antonio; but instead of making the sale in front of the county courthouse door (the Texas statute being the same as our own on this subject), the marshal made it in front of the federal building, standing on the opposite side of the street from the county building. The court held that the statute fixing the time and place of sales was mandatory, and that place meant in front of the county courthouse door, not some other

place in the same community or vicinity, and that the sale was not simply *voidable, but void.*

By sec. 3 of the act of congress, approved May 19, 1828, it was provided:

"That writs of execution and other final process issued on judgments and decrees rendered in any of the courts of the United States and proceedings thereon shall be the same, except their style, in each state, respectively, as are now used in courts of such state; *provided, however,* that it shall be in the power of the courts, if they see fit in their discretion, by rules of court, so to alter final process in said courts as to conform the same to any change which may be adopted by the legislature of the respective states for state courts." Quoted from opinion in *Beers* v. *Houghton,* 9 Pet., 337. This statute is the origin of sec. 914 of the present Rev. Stats. U. S.

By sec. 4 of a special act of congress, approved February 16, 1838, it was provided:

"That the marshal of the several districts of the state of Mississippi, in addition to the several sale days now allowed by law, may be authorized to sell property at the courthouse in each county on Monday of each week, and on the first and second days of each term of the district court; and he may, at the written request of the defendant, change the sale of property to the place where the United States court for the district is holden; *provided,* in the opinion of the marshal, the interest of the plaintiff is not compromitted thereby."

The state statute which governed in matters of this character, except in so far as modified by this special act of congress, provided that all sales of land should be made at the courthouse of the county and on the first and third Mondays of every month. Sec. 17, Act June 22, 1822; How. & Hutch. Dig., 633.

The courts, both state and federal, have, in passing upon the validity of execution sales made by federal marshals, uniformly held that the federal officer in the execution of process of this kind must conform strictly to the state law. In *Smith* v. *Cock-*

*rell,* 6 Wall., 756–759, the supreme court of the United States held that the failure of a United States marshal, in selling property under execution in the state of Kansas, to have an appraisal made in accordance with a statute of Kansas, rendered the sale void and conferred no title. See also *Moody's Heirs* v. *Moeller,* 72 Tex., 635 (13 Am. St. Rep., 839); *Norneman* v. *Norris,* 47 Fed. Rep., 438.

There is no special presumption hedging around the acts of United States marshals in executing process, even though hoary with age and come to us from so respectable a source as the administration of Martin Van Buren. And if it appear from the alleged return on this ancient document that the marshal disregarded a plain provision of law, then his acts were void and incapable of transmitting title. It is manifest that this marshal had no legal power or authority to make a sale, under execution, of land then situated in Hancock county, in Jackson, except upon the *written request* of the defendant, James McLaran. And if the United States marshal held such request, the only place in Jackson where he was authorized to make such sale was in front of the building or *place* where the United States court was held at the time. Now, if the court will inspect this exhibit, it plainly appears that this marshal made two different sales of land under it. The first sale was made on the 7th day of October, 1839, in front of the statehouse in Jackson, of several tracts or bodies of land in various counties, and this first sale, as appears by the express language of the so-called return, was made at Jackson on a *written request* of the defendants in execution. The alleged sale of the lands in controversy, as appears by this so-called return, was made three weeks later, or on the 28th of October, 1839, in Jackson, but not one word is said about its having taken place there because of any *written request* or other request of defendant in execution. The law having fixed the place of such sales at the county courthouses, and the marshal being required to make such sales there, except where a defendant should make a *written request*

otherwise, we insist that the existence of such written request was absolutely necessary, and that the court cannot presume in a case like this, where all of the acts of the officer are set out, and where it is silent on this point, that such request existed. We undertake to say that in a case of this kind, where no deed was ever executed and where the sole evidence of such sale is the so-called return, the return itself is not sufficient proof of the existence of such a vital and jurisdictional fact, and that the writing itself must appear.

The word "place" in this special act of congress, authorizing sales at the place where the United States court is held, had reference to the building in which it was held. The object of the rule requiring a strict compliance with statutes fixing the time and place of judicial sales would altogether be defeated by holding that place within the statute meant anywhere in the municipality or vicinity of the court. As held in *Moody's Heirs* v. *Moeller, supra,* it means the building in which the court is held, and that a sale in the same town or city is not a compliance with the law. There is nothing, either in the bill or the return on the execution, to show where the federal court was holden in 1839.

It has been expressly held in *Cooper* v. *Granberry,* 33 Miss., 117, that a return on a writ of execution reciting a purchase by a person named does not operate to transfer the title, but simply confers a right, if payment is made, to compel either the sheriff or defendant in execution, as the case may be, to execute a deed conveying the title. In this case the court uses the following language:

"It is again said that the return on the execution under which G. W. Cooper purchased the land, when it was sold as the property of the defendant, shows that one Walker bid off the land. The return does not transfer the title. It is at most only evidence that Walker was entitled to demand a deed from the sheriff, and he could, if disposed to, assert his right, force the sheriff (or Cooper, holding the deed from the sheriff) to convey

to him, Walker. But in the absence of a showing that his bid was consummated by a deed, it will be presumed after this lapse of time that he transferred his bid or did some act renouncing it."

The lapse of time in that case, as appears by the report, was fifteen years. Applying this rule to the case at bar, what presumption arises? Here no deed was ever executed by the marshal, and no act of possession alleged by the purchaser, his heirs, or vendees, and sixty-five years afterwards the lands are in the occupancy of defendants. The only presumption that can arise, or that is entitled to a moment's consideration, is that John Martin either renounced and abandoned his bid or transferred it, if indeed it had any force, to those in privity with the present occupants. So we insist that every fact alleged in this bill, as construed in the light of the contents of the exhibits, shows that this pretended marshal's sale was void and incapable of conferring title, and that every presumption of law arising from the facts alleged irresistibly leads to the conclusion that this whole claim of title, founded upon this so-called return, is a myth and creation of the speculative values ruling around Gulfport.

The real purpose of this suit, and the ground upon which relief must be granted to complainants, if it is granted at all, is to divest the legal title out of James McLaran or his heirs, or out of the marshal or whomsoever it may be in, and vest it in these complainants. The mere return of this marshal, under *Cooper* v. *Granberry, supra,* being insufficient to convey the legal title, it, the legal title, necessarily remained in McLaran, the defendant in execution, for want of a proper deed to convey it; and unless the ancestor of complainants took possession so as to obtain a title by adverse possession or otherwise to protect his supposed equity arising from having bid in the lands, it was incumbent upon him or his heirs to file the necessary suit to divest the legal title out of McLaran or to compel the marshal, if he could, to convey it, and such a suit

is required by sec. 2731 of the annotated code, which has been the law at least since 1857, to be filed within ten years after the right of action accrues, and not after. The pretended fraudulent concealment set up in this bill is wholly insufficient to protect complainants, for the reason that it is nowhere alleged that defendants or any persons in privity with them were the parties guilty of the acts complained of. *Fleming* v. *Grafton,* 54 Miss., 79. And, moreover, no facts are alleged constituting fraud, but mere vague conclusions. We also insist that these vague allegations of a fraudulent conspiracy, which has just been discovered in recent years, are themselves an admission that defendants and those under whom they claim have been in possession of this property beyond the statutory period.

*McWillie & Thompson,* on same side.

1. While the first sale is recited to have occurred "in the city of Jackson, at the front door of the statehouse," the second sale is merely recited to have occurred "in Jackson."

The federal statute provides that on the written request of the defendant the place of sale may be changed from the county courthouse to "the place where the United States court for the district is holden."

The statute did not mean any place in the town or city where the court might be holden, but the particular place therein, the building, in which the court's sittings took place. If, therefore, we read "in Jackson" to mean in the city instead of the county of Jackson, the return does not show compliance with the law. In the same sentence authorizing the change on request of defendant, sales on Monday in each week are also authorized to be made in the counties; but it will be noted that these were not to be made merely at the county seat, but at the courthouse of the county, the particular building in which the public affairs of the county were conducted. The city of Jackson, under the municipal charter in force at the time of this sale, covered

quite an extensive area, much of which was virgin forest. Acts 1834, p. 136.

While it is really unnecessary to press the argument further along this line, we also insist that even if the recital as to the place at which the first sale was made be applied to the second sale, the bill remains equally bad on demurrer. Neither does the bill allege nor the return recite that the statehouse in Jackson was, at the time of the sale or making of the request, the place where the federal court held its sittings. That building was one erected by the state and devoted to state as contradistinguished from federal purposes, and to indulge a presumption that the federal court sat in it because of this return would be as irrational as to say that the same tribunal held its sittings at some hotel of the city, had the return mentioned such hotel as the place of sale. Moreover, such history as we have, written and unwritten, makes it wholly uncertain whether the marshal in using the word "statehouse" meant one or the other of two buildings then existent in the city of Jackson.

Certainly until 1839 the Mississippi statehouse was located at the northeast corner of Capitol and President streets in said city, on what is now the site of the well-known Harding building. In January, 1839, Governor McNutt, in his message to the legislature which had just assembled, congratulated the body that the construction of what is now the old capitol building had so far progressed as to admit of its sessions being held therein, although the building was far from being completed. We quote from memory, but feel sure that the legislative jour-See Mississippi Official and Statistical Register, 1904, pp. 586, 611, 612. The terms of the federal court in 1839 occurred, as they now occur, on the first Mondays in May and November; so that if any term had been held in what is now the old capitol, it could only have been the May term, 1839, at which time the building was doubtless unfinished, and the statehouse located on the site of the Harding building must have been of too small

dimensions to meet the needs of the state, much less -afford accommodations for the federal courts.   Doubtless during the period of transition from the one building to the other, and for some time afterwards both buildings were known as the "statehouse," and both could not have been the place where the federal court held its sittings.

Where a statute prescribes a place for sales under execution, it is to be taken as mandatory.  *Koch* v. *Bridges,* 45 Miss., 247.  The sale in the case was not made at the county courthouse, and was declared to be for that reason not merely voidable, but void, in a proceeding attacking it collaterally.

The name of the town in which the federal court sat would not designate the place where it was holden within the meaning of the statute in question.  *Hartley* v. *Cazye,* 38 Minn., 325.

.2. The complainants do not allege in their bill that the executions under which the land was sold were issued upon valid judgments of the federal court, nor that any judgment was ever rendered against the defendants in execution; but as the bill makes an obscure reference to "said judgment" and a certified copy of a judgment is exhibited as a part of the bill, we will treat the bill as alleging that the execution issued on that judgment.

The judgment exhibited with the bill is the final judgment rendered by the court in one of the cases mentioned in the marshal's return, *Wanzer & Harrison* v. *McLaran & Hammond,* and the execution under which it is claimed the land was sold purports to have been issued, not on that judgment, but on a forfeited forthcoming bond, the existence of which is not alleged.  Under the state law in force at that time, and by which procedure in the federal courts was regulated, after forfeiture of a forthcoming bond, execution was not issuable on the judgment of the court, but on the bond.  Hutchinson's Code, p. 910.  Furthermore, it is well established that the acceptance by the officer of a forthcoming bond under the statute cited operated as satisfaction of the judgment of the

court and extinguished its lien. *Connell* v. *Lewis,* Walker (Miss.), 251; *Stewart* v. *Fuqua, Ib.,* 175; *Sampson* v. *Breed, Ib.,* 267; *Davies* v. *Dixen,* 1 How. (Miss.), 64; *Weathersby* v. *Proby, Ib.,* 98; *Bank* v. *Patton,* 5 *Ib.,* 200; *Chilton* v. *Cox,* 7 Smed. & M., 791; *McComb* v. *Ellett,* 8 Smed & M., 505; *Robinson* v. *Painter,* 8 Smed. & M., 613; *Pritchard* v. *Myers,* 11 Smed. & M., 169.

The original judgment being merged in the statutory judgment on the bond, an execution issued on it is void. *Bell* v. *Tombigbee R. R. Co.,* 4 Smed. & M., 549; *Moody* v. *Harper,* 28 Miss., 615; *Witherspoon* v. *Spring,* 3 How. (Miss.), 60; *King* v. *Terry,* 6 How. (Miss.), 513; *Brown* v. *Clarke,* 4 How. (U. S.), 12, 13.

It is thus seen that the complainants, who do not allege that any forthcoming bond was ever given, rely on a judgment that was satisfied if it was given, and on an execution which was void if issued on the judgment they set up as authorizing it.

The judgment relied on was satisfied before the issuance of the execution, if a forthcoming bond was given, and an execution issued on a satisfied judgment is void, especially where it discloses to the purchaser under it the fact of the satisfaction of the judgment. If no forthcoming bond was given, the execution in question was void, for it purports to be founded on a statutory judgment which could not exist without the necessary precedent conditions of the existence and forfeiture of a forthcoming bond, and is against a new party, the surety on the alleged forthcoming bond, who was a stranger to the original judgment.

The bill is clearly obnoxious to demurrer, for the reason that it does not allege that a forthcoming bond was given and forfeited, for the sale relied on was under an execution which was not authorized by law except after the forfeiture of a forthcoming bond, and the showing made of the original judgment in no wise helps the case.

"One predicating title to property on an execution sale must

show that there was a valid, subsisting judgment under which the sale was made pursuant to a valid execution." 25 Am. & Eng. Ency. Law (2d ed.), 821. This principle so pervades the judicial system of our own state as to make the citation of decisions superfluous.

3. A most important question arises on the consideration of § 2731, Code 1892, prescribing a limitation as to suits in equity by persons claiming land, which has never, so far as we are aware, been expressly adjudicated by this court.

The limitation as to actions at law for the recovery of land (sec. 2730) prescribes that no such suit shall be brought but within ten years next after the time at which the right to make the entry or bring the action shall have first accrued to the plaintiff or some person through whom he claims. In other words, if the defendant has had continuous adverse possession for ten years, the plaintiff's action at law will be barred by this section of the code.

The section relating to suits in equity by persons claiming lands is quite different, however, and does not prescribe that they cannot be brought but within ten years after the right to make an entry or bring an action at law shall have accrued. On the contrary, the provision relates to time only, and in no way to the condition of adverse possession; and there is nothing therein of which to predicate the adverse possession idea, since a defendant's possession is not essential to a complainant's right to sue in equity. It prescribes merely that such suits shall not be brought but within the period during which by virtue of § 2730, Code 1892, an action at law might have been brought— that is to say, within ten years after the accrual of the right to proceed in equity, which is wholly unaffected by the question of possession.

This view is in perfect harmony with the spirit of the law, which manifestly contemplated uniformity in time—that is to say, that the period of prescription should be ten years next after the right of action shall have accrued at law and ten

years next after the right to proceed in equity shall have accrued. Insisting that this statute is available in cases where there has been no adverse possession by defendant, we invite consideration of its terms.

4. If ever a proper case existed for the application of the doctrine of *laches,* this is the case.

. In the later decisions of this court, where the doctrine of *laches* has been considered, the party against whom it was invoked will always be found, we think, to have been the holder of the legal title. Under the law in force when the sale in question was made, the execution of a deed by the officer was essential to the vestiture of title in the purchaser. Hutchinson's Code, p. 907.

These complainants do not show by their bill that they have the legal title, but assert a supposed equity, and the consideration of the cause involves, therefore, a comparison of the equities of the parties complainant and defendant.

5. The court will observe that the return on the execution nowhere sets out the state or county in which the land is located, but does describe it as being "in the vicinity of Mississippi." The language quoted cannot be an error in the transcript, as we are informed by counsel who represented defendants in the lower court that in several copies of the certified copy held by complainants, which have come under their observation, the language is precisely identical with that shown by the transcript.

According to this recital the land sold at the second sale was not in Mississippi, but in the vicinity of that state. To be in the vicinity of certain territory is to be outside of it, although close to it, and proximity and remoteness are alike as to that matter, since both denote land outside of such area. To be in the vicinity of a place is not to be in the place nor necessarily even adjacent or contiguous to it, but in the neighborhood of it. 28 Am. & Eng. Ency. Law (1st ed.), 449; Anderson Law Dictionary, title, "Vicinity."

If the governmental subdivisions had alone been given, an argument might be made for the sufficiency of the description as meaning land of that description within the district of the marshal, but that will not do where the return shows that the land is not in, but "in the vicinity of, Mississippi." The sale being *in invitum* the intention of the officer cuts no figure in the matter.

*Harper & Harper,* for appellees.

This is a bill filed by the appellees to remove clouds from the title to certain lands of which they claim to be the real owners in Gulfport, county of Harrison, and state of Mississippi.

They deraign their title as follows: First—A patent to the land from the United States government to James McLaran. Second—A purchase by their ancestor, John Martin, at execution sale under a federal judgment, obtained in the federal courts at Jackson, Mississippi, about the year 1837, and sold under judgment in the year 1839. The bill was demurred to, and the demurrer was overruled by Chancellor Stone Deavours, in vacation, from which decree overruling the demurrer, an appeal was taken, and the case now stands here for the determination of this court on the single question as to whether the chancellor properly or improperly overruled the demurrer.

The bill shows that the said John Martin purchased the land at execution sale, paid his money, and the same was knocked off to said John Martin as the highest and best bidder for cash; that he was placed in possession of the property by the United States marshal by and with the consent of the judgment debtor, James McLaran; that he continued in possession until the time of his death, in the year 1848, and that his heirs have been in possession, constructively without their knowledge, until a few years ago; that certain parties, most of whom were unknown to the appellees, knew of the claims, right, and title of the Martin heirs to this land, and had legal evidence of their title to this land in their own possession, which they carefully and

intentionally concealed from these heirs of John Martin for their own individual advantage. The main actor in this transaction was the administrator of the James McLaran estate, a man whose position gave him a full and perfect knowledge of the indebtedness of McLaran and of the sale by the federal marshal, and also of the purchase of said lands by John Martin.

These heirs of John Martin who had for years been kept ignorant of the right and title of their paternal ancestor, John Martin, at length, by a mere accident, became aware of the fact through the unremitting efforts of purchasers to secure a perfect and cloudless title, which could not be done while the John Martin claim was kept in abeyance and a profound secret to all except this administrator of the McLaran estate and his associates. As soon as the discovery was made, the heirs took steps to bring suit for the recovery of the land. Hearing that J. T. Jones, one of the appellants, had offered to donate a portion of this land, situated in Gulfport, Harrison county, Mississippi, to the board of supervisors for courthouse purposes, and that this board had the acceptance under consideration, these heirs notified, through their attorney, the board of supervisors in open session not to accept the donation, as the right, title, and interest in the land belonged to these heirs of John Martin, and gave them a full outline of the character of this title, and that they were getting ready to sue for the land, and that if the county accepted this donation it would lead to litigation that would be expensive and troublesome. But the county accepted the donation in the face of all the conditions and warnings; or, rather, the board of supervisors accepted the donation.

The bill shows these facts, and was demurred to. The demurrer was overruled, and the parties required to answer. The question before the court at this time is, Whether the bill on its face presents such a title as can be the foundation for a permanent removal of a cloud.

The certified copy of the record in the case, under which

John Martin bought at execution sale, shows a valid judgment, a valid execution, a valid levy, and a valid sale by a United States marshal, together with a memorandum in writing to whom sold, and all essential particulars necessary to take the case out of the statute of frauds, and conferred on the purchaser an equitable title and also an inchoate legal title to the land in question.

This fact cannot be denied, either under the state decisions or under the decisions of the courts of the United States. The heirs do not present a copy of the marshal's deed, it is true, made in pursuance of this sale to their ancestor, John Martin, which should have been, and doubtless was, recorded in the county of Hancock, where the lands were at that time, as all of Harrison at that time was a part and parcel of Hancock county. By reason of the great lapse of time, the marshal's original deed cannot be found, the courthouse of Hancock county having been destroyed by fire and the records all lost.

Some of the courts have held—notably in the states of Maryland, Louisiana, and Texas—that this title without a deed is in all respects a good and valid title and will support an ejectment even if no deed has been made. *Boring* v. *Lehman,* 5 Harr. & J., 233; *Leland* v. *Wilson,* 34 Tex., 91; *Fleming* v. *Powell* 2 Tex., 225; *Jonet* v. *Mortimer,* 29 La., 206; *Litchicum* v. *Remington,* 14 Pet., 91; *People* v. *Boring,* 8 Cal., 406; *Rucker* v. *Dooley,* 49 Ill., 223; *Cottingham* v. *Springer,* 88 Ill., 90; *Harmon* v. *Learned,* 58 Ill., 169; *Summers* v. *Palmer,* 10 Rich., 98; *Swank* v. *Thompson,* 31 Mo., 336; *Curtis* v. *Millard,* 14 Ia., 176; *Robertson* v. *Garth,* 41 A. D., 47 (6 Ala., 204); Freeman on Executions (2d ed.), sec. 324, and authorities there cited; *Legere* v. *Doyle,* 11 Rich., 101; *Riller* v. *Scannell,* 7 Am. Dec., 77; *Stewart* v. *Stokes,* 33 Ala., 493; *Osgood* v. *Franklin,* 2 Wheat., 503; *Claggett* v. *Kilbourne,* U. S. Rep., 66 and 69 B; 17 bottom p. 212, L. C. P. Co., in the first and second Black and first and second Wallace; *Hooper* v. *Schumer,* 22 How., 235; *Finn* v. *Holmes,* 21 How., 481.

This case being in chancery, an equitable title is just as good as a legal title, although we shall insist that the Martin heirs hold and have not alone an equitable title and an inchoate legal title, but also have a perfect legal title by virtue of the lapse of upward of sixty years.

The bill shows that the ancestor, John Martin, was in possession of this land for more than nine years so far as was legally necessary to possession of wild lands as defined by law; certain it is that no other person claimed or possessed it during the years between 1839 and 1848.

At his death the legal seizin of this land descended to the heirs of John Martin, who remained in the constructive possession of the land until a few years since, as no one claimed or was in actual possession of this land. *Stumper* v. *Griffin,* 20 Ga., 312.

"The law, however, deems every person to be in the legal seizin and possession of the land to which he has a perfect and complete title, and this seizin and possession is coextensive with his rights, and continues until he is ousted thereof by an actual possession in another under a claim of right. This may be considered a settled principle of the common law, and has been recognized and adopted by the supreme court of the United States."

In regard to the number of years intervening between the death of John Martin and the suit brought by his heirs at law to establish their claim, see the following authorities: *Halstead* v. *Grinnan,* 15 U. S. Rep., 417. Justice Brewer, delivering the opinion of the court, says: "The length of time during which the party neglects the assertion of his rights, which pass in order to show *laches,* varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defense controlled by equitable considerations, and the lapse of time must be so great and the relations of the defendants to the rights such that it would be inequitable to the plaintiff to now assert

them. There must, of course, have been knowledge on the part of the plaintiff of the existence of the rights, for there can be no *laches* in failing to assert rights of which a party is wholly ignorant and whose existence he had no reason to apprehend." *Foster* v. *Railroad Co., * 146 U. S., 99.

Lapse of time is no bar when fraud is involved. 6 Wheat., 497; 7 How., 825; 6 Wheat., 501; *Wilkerson* v. *Watkins, * 3 Pet., 34; *Doss* v. *Armstrong, * 6 How. (Miss.), 258.

The bill shows that the records of the federal court, where the case was pending, are lost or destroyed, perhaps during the civil war; that the party buying was not in possession; that it was the habit of this purchaser to record his deeds; that the records of the county of Hancock, where this deed should have been recorded, were destroyed by the burning of the courthouse at Bay St. Louis; that there were large sales of other lands in other counties made under the same executions by the same marshal at the same place—at Jackson, Mississippi, the place authorized by law for such sales to be made; and one of the bills shows that all the deeds were recorded in Rankin, Madison, and Hinds counties, where the records have not been destroyed by war or fire. This makes the non-appearance of this specific deed a clear case of accident. The presumption of its having been made is manifest under the authorities. 6 Wheat., 497 to 555.

We call attention to the case of *Reed* v. *Vaughan, * 55 Am. Dec., 134, where it is said the courts of the United States, though possessing a limited jurisdiction, yet in the intendment of law, stand upon the same footing as courts of record of general jurisdiction. All of the presumptions which are indulged in favor of superior tribunals of general jurisdiction are equally extended to the courts of the United States.

In pleading a judgment or a decree of one of the courts there is no more necessity for showing the facts which confer jurisdiction than in a plea of judgment of the highest tribunal known to the land. On the former point we cite the case of

*Thomas* v. *Malcolm,* 99 Am. Dec., 459, which says courts go very far in upholding judicial sales, in presuming that officers in executing their process have performed their duty, especially after a great lapse of time. An officer is presumed to do his duty. *Bradley* v. *Sandelany,* 61 Am. St. Rep., 386; *Neal* v. *Nelson,* 53 Am. St. Rep., 590; *Evans* v. *Robertson,* 1 Am. St. Rep., 701.

A sale made by a United States marshal will be deemed valid until set aside by federal courts. *Kennedy* v. *Shepperly,* 57 Am. Dec., 29.

Argued orally by *James H. Neville,* and *T. A. McWillie,* for appellants, and by *A. Y. Harper,* for appellees.

HOUSTON,* J., delivered the opinion of the court.

This was a bill filed November 11, 1903, by appellees, William O. Rogers, *et al.,* against J. T. Jones and Harrison county, and also against the five parties constituting the board of supervisors of said county, as individuals and as members composing said board, to remove clouds from the title of complainants to certain lots in Gulfport, Harrison county, upon which the county courthouse and jail have been erected, specifically praying that a deed from S. S. Bullis to J. T. Jones, dated March 1, 1902, and one from J. T. Jones to said defendants, members of the board of supervisors, dated June 24, 1902, to said lands, be canceled and declared void as against complainants; that a writ of assistance issue to put complainants in possession of said lands, and that an accounting of the damage, destruction, and waste of a permanent nature committed by defendants be taken, and personal decrees be rendered against them for the amount found due, and also for a reasonable rent from the date of their occupation of said land.

The bill alleges that complainants "are the lineal descendants and sole surviving heirs at law of John Martin, deceased, who

---

*Chief Justice Whitfield, owing to illness, was off the bench when this case was argued, submitted, and decided. W. D. Houston, Esq., a member of the supreme court bar, was duly appointed, and presided not only in this case, but generally in the absence of the chief justice.

was their *'ancestor,'* and who died intestate in New Orleans, La., in 1848, seized and possessed in fee simple" of said land. And they deraign their title as follows:

1. A sale of said land to James McLaran, December 11, 1834, and a patent issued to him by the United States government January 5, 1841.

2. A purchase by their said "ancestor" at a sale made by United States Marshal Gwin, on October 28, 1839, at Jackson, Miss., under an execution issued June 11, 1839, on a judgment rendered by the United States circuit court at Jackson, Miss., November 16, 1837, in the case of *Wanzer & Harrison et al.* v. *McLaran & Hammond;* that said lands were duly advertised and sold in the city of Jackson at the front door of the statehouse, at which sale they aver that "said John Martin became the highest bidder for $760; that said lands were knocked off to him, and he then and there paid the purchase money to said United States marshal, and that he (Martin) owned the same until his death, and that his heirs had never sold or disposed of same in any manner whatever;" that said James McLaran, defendant in execution and also patentee of said land, *yielded up possession* of said land after sale of same on October 28, 1839, and never afterwards during his life exercised any acts of ownership or claim whatever over same; that *divers* persons *set about* to defraud and cheat complainants out "of said lands, and did, without authority of law, sell and convey same and concealed as far as possible all facts of this sale, when *they* knew that John Martin was the owner by virtue of said sale of all the right, title, etc., which said McLaran had in and to said lands; and they knew when Martin died, in 1848, that his said heirs became vested with all right and title thereto which said Martin and McLaran had to same, but, notwithstanding this fact, and that they knew of the residence of complainants, yet they did combine and confederate to get possession and dispose of said lands, and did conceal and secrete all the facts from complainants, who were *then* infants;

and that complainants have just of *recent years* learned the *facts* in connection with the *sale* and *purchase* of said lands, and, after learning that they had been defrauded and cheated of their *bona fide* property, they at once set about establishing their claim; hence the delay in bringing this suit."

It further alleges that J. T. Jones, under a spurious deed, duly recorded, pretends to have title to said lands, and has gone into *possession* thereof, and, although he had no right or title, he made a deed thereto to Harrison county, or to the members composing its board of supervisors and to their successors in office, conditioned that if said county shall at any time cease to use said land for a courthouse and court purposes, then the title shall cease and revert to said grantor; that said board did then and there combine and confederate with co-defendant, Jones, to cast a further doubt and cloud on the title of complainants, and did then and there record an order on their minutes, accepting this conditional deed of gift in their own name, over the objection and protest of complainants; and that said deed and order of acceptance are void under § 303, Code 1892, as being *ultra vires;* that said board has erected on said land a courthouse, etc., against the consent and protest of said complainants, which constitute a public and private nuisance and ought to be abated. Copies of both of the above deeds, and also of the judgment, execution, and return thereon, are made exhibits to the bill.

In view of the importance of this suit and of the fact that we have been informed that this is a test case as to many others involving the same question, we have thus fully set out all of the material allegations of the bill, in order that the grounds upon which our decision is based may be manifest.

To this bill separate demurrers were interposed by J. T. Jones and by his co-defendants, the members of the board, both in their individual and official capacities; but the main grounds of both demurrers are substantially the same. Aside from the *general* ground of want of equity on the face of the

bill, for the sake of brevity and perspicuity, the *special* causes of demurrer assigned may be grouped as follows:

1. That the allegations of the bill do not warrant the *legal* conclusion that complainants are all the heirs at law of John Martin or that they have any title or interest in said lands.

2. That the bill seeks to divest the legal title out of the heirs at law, devisees or legal representatives of James McLaran, the patentee and defendant in the execution, but does not make any of them parties; and, hence, there is a non-joinder of parties.

3. That, upon the facts averred in the bill and exhibits, the alleged sale of October 28, 1839, was not made either at the time or place fixed by law for making such sales, and was void, and John Martin acquired neither the legal nor equitable title to said lands thereat.

4. That whatever right or interest complainants or John Martin acquired under said sale is now barred by the ten years' statute of limitations.

5. That the alleged fraudulent concealment that has, for a half century, kept complainants in the dark as to their rights, is not alleged to have been the act of any of defendants or any one in privity with them.

6. No facts stated from which any *conclusion* can be drawn that complainants have been defrauded by any one acting in concert with, or in knowledge of, defendants.

Both demurrers being overruled, the defendants were granted, and prosecuted, this appeal.

We waive a discussion of the first and second causes of demurrer as above set forth, as, in our opinion, the case can and should be decided upon *broader* lines.

In bills to remove clouds from title certain general principles have been so well and so long settled in this state as to have become almost axiomatic. In fact, it would hardly be necessary to *state* them, but that their proper application to

the facts alleged in the bill and exhibits in this cause will, in our opinion, be determinative of this controversy.

Those general principles are that when a party comes into a court of equity and asks its active intervention to vest title in him or to remove clouds from his title and cancel the title of a defendant, it is incumbent upon him to allege and show that he has a *perfect* legal or a *perfect* equitable title to the property; that if he fails in this, he must necessarily fail in his suit, as, without such a title, he is not the *"real owner"* within the contemplation and the very language of our statute (Code 1892, § 500), as was expressly held as far back as 1873 in the case of *Carlisle* v. *Tindall,* 49 Miss., 229, in construing the words *"real owners"* used in Code 1871, § 975.

And this, regardless of whether the title of defendant be *good* or *bad, valid* or *invalid.* Complainants in such cases have no reason to concern themselves about the title of the *adversary,* and cannot even bring it in *question.* In fact, a complainant need not even point out any defects in defendant's claim, even though he may describe in his bill the instrument on which such claim is based. He cannot maintain his suit because of. any *defects* that may exist in *defendant's* title. He must recover, if at all, on the *validity* of his *own.*

It would be a vain parade of research to cite all of the decisions of this court sustaining these propositions, which of course are recognized by learned counsel for appellees. Many cases will be found in the annotations under Code 1892, § 500.

We only deem it necessary to cite the following (not annotated), which *distinctly* and *specifically* announce these principles: *Hart* v. *Bloomfield,* 66 Miss., 100; *Goff* v. *Cole,* 71 Miss., 46; *Wilkinson* v. *Hiller,* 71 Miss., 678; *Gregory* v. *Brogan,* 74 Miss., 699; *Wilberger* v. *Pucket,* 78 Miss., 650.

Now, waiving any discussion as to the validity or invalidity of the title of defendants under their respective deeds, which would be but a consumption of time, in view of the conclusion

we have reached, let us consider whether the bill and exhibits allege such facts as show that complainants have either a perfect legal or a perfect equitable title to the lands for which they bring this suit.

It will be observed that the bill does not aver, and complainants do not claim, that they or their ancestor, John Martin, have or ever had a *deed* of any kind whatever to said lands, or that they became the real owners by adverse, open, and notorious possession thereof.

Upon what, then, do they base their claim that they are the real owners, either legal or equitable, of the lots in controversy? This is answered not only by the brief of counsel for appellees, but, after alleging the marshal's sale of October 28, 1839, before mentioned, the bill *expressly* and *explicitly* alleges "that they" (complainants) "are claiming their rights and title to this property under this *marshal's sale.*"

Without considering or deciding as to whether McLaran, to whom no patent was issued until January 5, 1841, had any title subject to sale under execution on October 28, 1839, or as to whether the pleadings show that this was a sale under a *valid* execution, based upon a *valid* judgment—and, if so, whether said judgment had been previously satisfied—we proceed to consider "Exhibit A," filed with the bill, which, under Code 1892, § 528, "must be considered on demurrer as if copied in the bill." Indeed, the bill specifically states that the "facts of this sale will more *fully* and *at large* appear" by reference to "Exhibit A," which is prayed to be made a part thereof. This "Exhibit A" is a certified copy of the following papers:

1. A judgment by default, rendered November 16, 1837, by the United States circuit court in the case of *Wanzer & Harrison* v. *McLaran & Hammond,* for the sum of $4,121.86.

2. The execution issued, June 11, 1839, on said judgment.

3. The marshal's return on said execution. This return shows that the marshal made two *separate, different,* and *independent* sales of lands under this execution. The recitals of

the return which relate to the sale of the *lands in controversy,* on October 28, 1839, are as follows:

"This execution, together with the others mentioned above, was also levied on the following described lands—to wit: Secs. 35 and 36 in T. 7, R. 11, west, and fractional secs. 1, 2, 3, 8, 9, and 10 in T. 8, R. 11, west—all lying on or near the seashore in the *vicinity* of Mississippi—which said lands, after having been duly advertised, were sold *in Jackson,* on the 28th day of October, 1839, to John Martin, for the sum of $760, he being the highest, best, and last bidder." Signed "Wm. M. Gwin, Marshal, per *F. S. Hunt."*

It will be noted that this *return* does *not* even recite or show that John Martin, through whom complainants claim, ever *paid* his $760 bid for said land; but the *bill does* allege this, and hence, on demurrer, this fact must be taken as admitted.

It will also be observed that this sale and return purport to have been made and the return is signed not by the United States marshal *himself,* but by "Wm. M. Gwin, marshal, per *F. S. Hunt,"* while the bill alleges that the "sale was made by the *marshal* of the United States, *Wm. M. Gwin."*

Of course, it is well settled in this state that when an exhibit is made a part of the bill, by Code 1892, § 528, and is contradictory to some averment in the bill, the fact will be taken in conformity with the exhibit. *House* v. *Gumble,* 78 Miss., 259; *McNeill* v. *Lee,* 79 Miss., 459.

It is insisted by appellants that the question as to whether the alleged return by the United States marshal is in *fact* such a return by said officer or by some private person, and the *legal construction* to be given this return, are questions for the court, regardless of the averments of the bill; that the so-called return is not signed by any person *claiming* or *assuming* to act as the United States marshal, or by any person *styling* himself the deputy or properly authorized agent of such officer; that *who* "*F. S. Hunt"* was, nowhere appears from this record; and that, therefore, the sale was void.

We refrain from deciding the question thus presented, preferring to predicate our conclusion upon other and more important grounds; for, in our opinion, this sale to John Martin is absolutely void, under well-recognized principles, for many reasons, *inter alia:*

1. Because the land alleged to have been sold was *insufficiently* described. The return on the execution utterly fails to show the county or the state in which said lands were situated, nor does it show anything from which this can be determined.

It described all of the lands sold at that sale as "lying on or near the seashore in the '*vicinity*' of Mississippi."

According to this description, none of this land was *in* this state *at all,* but was "in the '*vicinity*' of Mississippi."

Certainly, to be in the "*vicinity*" of a certain county or state is not to be *in* that county or state, but to be *outside* of it, though near it, only in the *neighborhood* of it.

Etymologically and by common understanding, "*in the vicinity*" means in the neighborhood, and "neighborhood," as applied to place, signifies nearness.

"In the vicinity" does not even mean adjoining to or abutting on, but merely close by or neighboring country. Webster's International Dictionary, revised and enlarged; Anderson's Law Dictionary, title, "Vicinity;" English's Law Dictionary, title, "Vicinity;" vol. 8 of "Words and Phrases Judicially Defined," p. 7317; 29 Am. & Eng. Ency. Law (2d ed.), p. 1056.

We deem this so clear as to require no further elucidation.

The other descriptive words, "*on or near* the *seashore,*" cannot help the description, for the land might be "on or near the seashore" and still be in any state, from Mexico to Florida, except Mississippi; for the recital describing the land as being "in the *vicinity* of Mississippi" shows absolutely that it is not *in this* state.

2. This sale was not made at the place prescribed and required by the law under which it was made. The language

of the statutes in force at the time this sale was made, as to *where* such sales should occur, is clear and unmistakable.

Section 3 of act of congress, approved May 19, 1828, provided: "That writs of execution and other final process issued on judgments and decrees rendered in any of the courts of the United States and proceedings thereon *shall* be the same . . . in *each* state, respectively, as are now used in courts of *such* states," etc. *Beers* v. *Haughton,* 9 Pet., p. 337 (Lawyer's ed., book 9, 149); *Smith* v. *Cockrell,* 6 Wall., 756 (L. ed., vol. 18, 973). This statute is the origin of sec. 914 of the Rev. Stats. U. S.

Section 4 of a special act of Congress, approved February 16, 1838, provided: "That the marshal of the several districts of the state of Mississippi, in addition to the several sale days now allowed by law, may be authorized to sell property at the *courthouse* in *each county* on Monday of each week and on the first and second days of each term of the district court; and he may, at the *written request of the defendant,* change the sale of property to the *place* where the United States court for the district is holden; *provided,* in the opinion of the marshal, the interest of the plaintiff is not compromitted thereby."

The Mississippi statute, which governed such sales at the time this one was made, provided that all sales of land should be made at the *courthouse* of the *county,* and on the first and third Mondays of each month. Sec. 17, Act June 22, 1822; How. & Hutch. Dig., 633. Decisions of the supreme court of the United States, as well as of various states, have placed beyond the realm of controversy the proposition that United States marshals in the sale of property under execution *must* sell it in *strict conformity* to the state law, otherwise it is void and can confer no title whatever. *Smith* v. *Cockrell,* 6 Wall., 756 (L. ed., vol. 18, 973); *Boneman* v. *Norris,* 49 Fed. Rep., 438.

Statutes fixing the place of sale of lands under executions are *mandatory,* and *not* merely *directory;* and it is the *impera-*

*tive* duty of officers to make such sales at the very place des-
ignated, and a sale made at any *other* place is not *voidable
merely,* but absolutely *null* and *void.* The place of sale is the
very *essence* of the sale, and strict compliance with the statute
is absolutely essential in order to transfer a good title to realty.
*Koch* v. *Bridges,* 45 Miss., 257; *Loudermilk* v. *Corpening,* 101
N. C., 649; *Sinclair* v. *Stanley,* 64 Tex., 67. In *Moody's Heirs*
v. *Moeller* (Tex.), 13 Am. St. Rep., 839 (the Texas statute
being the same as Mississippi's as to the place of sale), a United
States marshal made the sale, not in front of the door of the
*courthouse* of the *county,* but in front of the door of the *United·
States court* building, standing just on the opposite side of the
street from the county courthouse. The court held that the sale
was not simply and merely *voidable,* but was absolutely *void,*
incapable of ratification and subject to a *collateral* attack, and
that the acquiescence of the defendant in the execution in such
a void judicial sale gave no validity to it.

It is, perhaps, proper in this connection to call attention to
the allegation of the bill that the lots in controversy were, at
the time of the sale, in fractional sec. 9, T. 8, R. 11, west, of
*Hancock* county, though they are now, of course, situated in
*Harrison* county, which was formed out of Hancock county in
1841.

The return of the marshal expressly recites that these lands
were sold, not at the courthouse in the county of Hancock, where
the land was then situated, but *"in Jackson."*

The law (which was *mandatory,* and *not* merely *directory*)
made it the imperative duty of the marshal to sell the land
at the *county courthouse* of the *county* where the land was sit-
uated, except where the defendant in execution should make a
*written request* otherwise, in which event *only* was the marshal
legally authorized or empowered to ."change the sale of the
property to the *place* where the *United States court* for the
district is holden." The existence of this "written request" on
the part of James McLaran, the defendant in the execution,

was a necessary prerequisite and a condition precedent to the power of the marshal to sell this land "in *Jackson*" or at any place other than at the *courthouse* of *Hancock* county. It was the *sine qua non* of his authority. Without it he was, by the very provision and language of the statute, only "authorized to sell property at the courthouse in *each* county" where the land was situated. Being a condition precedent, and a *vital, juris-dictional* fact, his return must have shown and proved it. Its existence cannot be *presumed*. Only the writing proves it. Congress certainly would never have required not only that such a request be made, but that it should be a *written* request, if it had intended that it could be established by *presumptions* or *suppositions* or *inferences*. But even if it were permissible to indulge in vague presumptions in regard to *vital, jurisdictional* facts affecting the title to land, we think the presumptions which could be drawn from this record would all be against the existence of a "written request."

As stated, this same marshal or party made two separate and independent sales of land under this execution; and in his return as to the *first* sale (of lands other than those here involved), made October 7, 1839, he not only expressly recited that this *first* sale was made at the front door of the state-house, in the city of Jackson, but also specifically recited that the "defendant had *consented* in writing that said sale should take place at Jackson;" and yet, although in his return as to the sale in *controversy*, made three weeks later, he sets out, or purports to set out, all of his acts as to this last sale, not one sentence or syllable is said as to the existence of any such written request, or of any character of request, of James McLaran that the land should be sold in "Jackson."

This return, setting out with great particularity the existence of the "written request," and all the facts as to *one* sale of certain *other* lands, and being noticeably and strangely silent as to the existence of any request relative to the sale of the land in question, would seem to be presumptive evidence of its non-

existence.  But even if we should presume or assume that there
was a "written request," then the marshal only had authority,
under the statutes cited, to change the sale of this land from
the county courthouse "to the *place* where the *United States
court* for the district is holden."

While the first sale is recited to have occurred in the city of
Jackson at the front door of the statehouse, the second sale is
merely recited to have occurred *"in Jackson,"* though the *bill*
does aver that the sale occurred at the *front door of* the *state-
house in* Jackson.

In our opinion, the word "place," as used in the statute, did
not mean *any* or *every* place in the town in which the court
might be holden, but the *particular* place, the *special* house, in
which the United States court held its sittings.  Surely, the
statute ought not to be construed to mean that the mere naming
of the city in which the court sat and the sale of land any-
where within the broad limits of that city would sufficiently
designate the "place" where it was held or be a strict com-
pliance with the statute as to the sale of realty, and it nowhere
appears either in the bill or exhibits that the statehouse in Jack-
son was, at the time of this sale, the *"place"* where the United
States court was holden.  *Hartley* v. *Cazye,* 38 Minn., 325.

Taking the pleadings as to all of these matters most strongly
against the pleader, we hold that the marshal, instead of strict-
ly conforming to the statutes in the sale of this land, palpably
violated their plain provisions.  While it is admitted that the
bill and exhibits do not allege or show that the marshal exe-
cuted a deed to John Martin, the alleged ancestor of complain-
ants, or that he or they ever had a deed of any kind whatsoever
to said land, or that any such deed ever existed, still able coun-
sel for appellees contend (to use their own language)-"that the
bill alleges circumstances and facts from which the court is
compelled to presume that a deed was made in this instance,
after an interval of sixty years," inasmuch as it was the habit
of said Martin to record his other deeds and as the bill alleges

that the records of Hancock county were destroyed by fire in 1853 and that the records of the *judgments* of the United States court were taken away, lost, or destroyed in 1861 to 1865.

Even if the habit of John Martin to record his *other* deeds would be presumptive evidence in favor of the pleader (against whom the pleading must be taken most strongly) that this *particular* deed existed and was recorded (where the pleader fails to so allege), still we find nothing in this record to show that such was the habit of said Martin. As to the destruction of the records, while the bill alleges "that no part of the records of land can be found in the said county of Hancock or of Harrison, in which said lands were situated," yet it totally fails to show that any such deed was ever recorded on those records or that any such deed ever in fact existed. As a matter quite of course, if no such deed ever existed (and the pleader does not allege that it did), then it could never have been recorded on those records, and hence the allegation as to the records being destroyed becomes immaterial.; at least we are not authorized, under the law, to presume therefrom that this particular deed was actually executed, and also that it was actually recorded thereon, and after thus creating one presumption in order to supply the facts which the pleader has failed to allege, then go a step further, and on this presumption raise and found another presumption, that all of the prerequisites and jurisdictional facts existed, authorizing the execution by the marshal of this very deed. However, it is further insisted that, after an interval of sixty years, the court should presume that this deed was actually executed, because in the first part of the bill it is alleged "that complainants' ancestor, John Martin, at the time of his death, in 1848, was seized and possessed in fee simple of these lands," and because the bill afterwards avers "that the defendant in the execution and the patentee of said lands *yielded up possession* of same after the sale of said lands on the 28th day of October, 1839."

In our opinion, the first allegation just quoted must be construed to mean simply, merely, and only that *constructive* possession which the law imputes to the holder of the legal title, and not that John Martin even then (away back in 1848) was in the *actual* possession of said land. At best it was but the statement of the *legal conclusion* of the pleader, and not a statement of the *fact,* that said Martin was in truth in the *actual* possession thereof, and, therefore, it is not admitted by the demurrer. This same observation applies to other averments of the bill, many of which are merely *legal conclusions.*

It will be perceived that the second allegation just quoted merely says that the defendant in execution *"yielded up possession"* of these lands "after" their sale. It does not show *when* or *to whom* he "yielded up possession," whether to John Martin or to some one else, and, if to John Martin, *how long* this was *after* the sale. If it be said that this means *immediately* after the sale, in 1839, he "yielded possession," then how long did Martin remain in possession, and what *time,* and by *whom,* and *how,* was he dispossessed? Not one of these facts is alleged, nor is there a sufficiently distinct and positive allegation even that Martin or any one claiming under him was ever, at *any time,* in the actual possession of these lands, as *could* easily have been done, and as the rules of pleadings require *should* have been done, if they were facts and complainants desired to rely upon them.

Under elementary principles of law, requiring us to construe pleadings most strongly against the pleader, we do not feel authorized to supplement the pleadings with our suppositions or to supply the facts with our presumptions, and assume that a certain state of facts existed in favor of the pleader which he himself does not allege, in order to presume that a certain deed in his favor was duly and legally executed and delivered. On the contrary, after sixty years have elapsed since this sale, and when the complainants fail to aver that there was any deed duly executed, or that their ancestor ever took possession, or

that he or they remained in possession (especially when they allege that *defendants* are now in possession), and when they rely *solely* and *merely* on the *return* of an officer under an execution, it would seem that if any presumptions should be indulged, it should be *against* the complainants *and against* the existence of the deed.

In the case of *Cooper* v. *Granberry*, 33 Miss., 117, the court said that "in the absence of a showing that his (complainant's) bid was consummated by a deed, it will be presumed after this lapse of time (fifteen years) that he transferred his bid or did some act renouncing it," holding also that a return on an execution does not transfer the *title*, but at most only gives a *right* to demand a *deed* conveying the *title*.

The case of *Normant* v. *Eureka Co.* (Ala.), 39 Am. St. Rep., 45, expressly holds that, before the court will presume that a deed was made by the officer, the purchaser must establish the fact that he not only *went* into possession under the sale, but *continued* in possession.

But even if this sale was a valid one, still we are clearly of the opinion that whatever rights complainants or John Martin may have acquired thereunder have been lost, and that they were barred by the statute of limitations when this suit was instituted on November 11, 1903, which was over sixty-four years after the sale occurred. Even if we could presume or infer from the allegations of the bill that John Martin went into possession and was in possession until his death, in 1848, still that was fifty-five years before complainants brought this suit to recover this land; and Code 1892, § 2731, requires "a person claiming land in equity" to bring his suit to recover same within the "period" of ten years after the right to recover it accrues, and this without regard to any question of adverse possession or whether the defendants have been in the adverse possession of the land or not. The adverse possession of defendant has nothing to do with the question or with the operation of this particular statute. A complainant has a right to

bring his suit in *equity* for land whether he is in possession or not and whether defendant is in possession or not; and if he does not bring it within the period of ten years after his right of action in a court of *equity* accrues, he is barred. The provisions of sec. 2731 relate to a *"period"* of *time* within which suits to recover land may be brought by any one "claiming the same in equity." This sec. 2731, in our opinion, is in the nature of a statute of rest. The complainants here are "claiming this land in equity," and, not having brought their suit to recover within the "period" prescribed by sec. 2731, are clearly barred, unless the allegations of their bill bring them within the last clause thereof, which is as follows: "But in every case of a concealed fraud the right of any person to bring suit in equity for the recovery of land, of which he or any person through whom he claims may have been deprived by such fraud, shall be deemed to have first accrued at, and not before, the time at which the fraud shall, or with reasonable diligence might, have been first known or discovered."

The bill only avers in a general, vague, and indefinite way that *"after* the sale" (which was over sixty-four years ago) *"divers* persons" (without stating *who*) set about to cheat and defraud complainants out of the lands (without stating *how*), and that these divers persons combined and confederated to get possession and dispose thereof, and concealed and secreted so far as possible all facts of this sale from complainants, who have just of recent years learned the facts.

These allegations immediately follow the statement in the bill as to the purchase of the land by Martin in 1839; and, construing the pleadings most strongly against the pleader, it would seem that these *"divers* persons" must have set about *at once* to cheat and defraud, get possession of this land and dispose of it, or it may be that it was not until the more recent year of the death of Martin, in 1848, as his death is expressly alluded to in this same sentence and connection, and just before the charge of the combination and confederacy is set forth;

and although this last date, even, was fifty-five years ago, yet complainants aver only in a *general* way that they learned of the facts just of *"recent* years," without stating how long they had known of it or what diligence they exercised in trying to discover it sooner.

To prevent this statute from beginning to run against them in favor of defendants, complainants must not only allege first fraud and the facts or acts constituting it; second, that these acts of fraud were committed by defendants or some one in privity with them; third, that they were concealed from complainants by defendants or their privies; fourth, that complainants did not discover or know of this fraud over ten years before instituting their suit; but, fifth, they must also allege and show that they exercised reasonable diligence to discover it sooner, or that they could not, with reasonable diligence, have discovered it sooner.

In our opinion, the bill in this case fails to sufficiently aver or show all or any of these necessary facts.

The bill does not disclose who the "divers persons" were who combined and confederated to cheat and defraud complainants and to conceal and secrete the facts; but the defendant, Jones, was hardly one of them, as the bill alleges that he was formerly of Buffalo, New York, but now of Gulfport, Miss., and the first connection that he or the other defendants had with these lands, so far as shown by the bill and exhibits, was in 1902. But, however this may be, the bill wholly fails to connect Jones or any of the defendants or their privies with these alleged acts of fraud, and this was absolutely necessary in order to prevent the running of the statute of limitations against complainants or to affect the rights of defendants. *Edwards* v. *Gibbs et al.,* 39 Miss., 166; *Fleming* v. *Grafton,* 54 Miss., 79.

In addition, the particular acts which constituted the fraud, combination, or confederacy are not alleged in the bill, but mere vague, indefinite, general, and uncertain averments are made.

And no principle is more firmly settled or more familiar to the profession than that fraud will not be inferred or presumed, and cannot be charged in general terms, but that the specific and positive facts which constitute it must be distinctly and definitely averred, and it must be shown that defendants participated therein.

This doctrine is nowhere more clearly, concisely, and forcibly stated than by Judge Truly in the recent case of *Weir* v. *Jones,* 84 Miss., 602 (s.c., 36 South. Rep., 533, 534), where the decisions are collated and cited. It is too well established and too widely recognized to require a further citation of authorities.

This opinion has been extended beyond ordinary limits, but as this appeal was prosecuted to settle the principles of the cause for future guidance, not only in this suit, but in others now pending, we have deemed it necessary to sacrifice brevity in order to attempt to attain perspicuity, especially as, after a careful consideration of this record, we have found ourselves unable to concur with the learned chancellor in his conclusions. We think the demurrer ought to have been sustained.

*The decree is reversed, the demurrer sustained, and cause remanded.*