McCAIN *et al. v.* COCHRAN *et al.*[*]

(Division A. Jan. 28, 1929. Suggestion of Error Overruled March 25, 1929.)

[120 So. 823. No. 26622.]

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2956, p. 978, n. 2; Damages, 17CJ, section 270, p. 974, n. 20; Fraud, 26CJ, section 51, p. 1130, n. 92; section 75, p. 1163, n. 14; 27CJ, section 162, p. 39, n. 92; section 199, p. 63, n. 89; section 219, p. 78, n. 17.

*Neville & Stone, S. A. Witherspoon* and *Currie & Amis,* for appellants.

249

*Baskin, Wilbourn & Miller,* for appellee, Rothenberg.

250

*Reily & Parker,* for appellee, Cochran.

*Bozeman & Cameron,* in additional brief for appellee, Rothenberg.

Argued orally by *J. H. Currie*, for appellants, and *R. E. Wilbourn* and *Marion W. Reily*, for appellees.

McGowen, J. The declaration in this case was filed in the circuit court of Lauderdale county by McCain and Arky, appellants here, demanding payment of two hundred seventy-five thousand dollars actual and punitive damages, of and from Cochran and Rothenberg, for alleged false representations made in the sale of a considerable quantity of timber, a sawmill outfit, a dry kiln, and a railroad about twelve miles long, operating from the sawmill in Mississippi to a point in Alabama connecting with the outer world; also the tramroad and appurtenances connected with the operation of a sawmill plant.

The declaration was in four counts; two counts thereof allege that the false representation was made *scienter* by Rothenberg and Cochran, and charged a conspiracy between these two, together with one West, to fraudulently induce the purchase of this timber, sawmill, and railroad by the appellants.

The other two counts do not charge a conspiracy by their actual language, but charge that, by a common plan, they sold this timber through false representation; they do not allege *scienter* on the part of the appellees as to the representations; neither do these counts seek to recover punitive damages.

This is the most voluminous record the writer of this opinion has ever had occasion to study. The briefs are voluminous, and every inch of the ground has been contested most vigorously and skillfully; and we shall not set forth the controverted facts in this case in detail, but will simply state enough of the case to make clear the decision of this court upon the various points raised on

appeal; and such facts, in the main, will be set forth in the discussion of such of the errors assigned as we think deserve to be mentioned.

The assignment of errors herein consists of ten typewritten pages.

Cochran owned the timber and other property involved in the sale. Rothenberg was very friendly to both Cochran and McCain. Cochran was a business man, operating sawmills, plantations, and stores. The evidence shows that he owed the corporation of which Rothenberg was a member several thousand dollars; and also that he owed Threefoot Bros. & Company, to the members of which firm Rothenberg was related, being an uncle, the amount of the indebtedness being about forty-five thousand dollars.

Rothenberg was an elderly man who had lived in Meridian, but for a good many years immediately preceding this transaction he had spent the greater portion of his time in New York. His main business was that of a dry goods merchant, and he was the buyer for the corporation, but had nothing to do with the credit, and had never had any experience whatever with timber.

McCain was president of a bank, had been connected with a bank for some time, had experience in loans on timber deals, and sawmill deals, to some extent.

Arky has had some experience in handling real estate, but, at the time of this transaction, was connected with a hotel.

West was not a party to the litigation; is a relative of Cochran's, and was employed by him in the operation of this sawmill, before this sale was made.

The purchase price involved here originally was one hundred forty-two thousand five hundred dollars, one hundred thousand dollars of which was evidenced by notes falling due for a term of several years, at stated intervals, and they were secured by a mortgage on the property sold.

Negotiations were begun by Rothenberg, who undertook to help his friend Cochran sell this property; the latter stating as his reason for the sale thereof that his wife was sick and he could not leave her. Rothenberg suggested that McCain could sell the property for him. This was five or six months before the sale was consummated. McCain and Cochran agreed that McCain would undertake to sell the property, and he at one time made an offer to Cochran for the property, which was rejected.

On the 27th day of January, 1921, at a time when Cochran was in Hattiesburg trying to consummate a sale to Colmer, Green & Company, after conferences between Arky, appellant here, and his brother, McCain and Hargrave, who went in with them on this deal, and Rothenberg, they repaired to a lawyer's office, and had drawn an offer of purchase of all the timber owned in Wayne county and in Choctaw county, as above, by Cochran, together with the other property mentioned; providing that the offer must be accepted on the following day by Cochran, which was done. No mention was made in this instrument of any quality of timber.

On February 6th, this offer having been accepted, the parties agreed on terms, the deed from Cochran to McCain and his associates was executed, the notes and mortgage were executed, and what is called a "cutting contract" was entered into.

Thereafter McCain and his associates formed a corporation, and proceeded to operate the sawmill and cut the timber for about eighteen months, when the corporation sold its interest to Stark Brothers, etc., and in their sale guaranteed and warranted that there were twenty-nine million feet of timber, which was claimed by Stark, after he had operated the plant for about nine months, to be short of the amount warranted, and Arky and McCain were compelled to make good their warranty.

An estimate of the timber was then had, and in this suit it is alleged that the timber on all the land was less than sixteen million feet.

The representation was that in this deal there were thirty-two million feet of timber, or more, on the land, and that Cochran said that he would stand behind thirty-two million feet of merchantable timber.

Rothenberg's representations, according to the allegations and evidence of appellant, were that there were more than thirty-two million feet of timber on the land; that it was the best bargain that they had ever had; that they could make a fortune, that they would have a profit on the deals; that they would make not less than one hundred thousand dollars thereby; and that the railroad known as the Washington & Choctaw Railroad had a large earning capacity, and that, while running the saw-mill, the railroad was capable of earning one thousand dollars a month; that Rothenberg stated to both appellants that he had no interest in the sale—when in truth and in fact Cochran owed the corporation in which he had stock a large sum of money, and owed the firm in which his kinsmen were interested a considerable sum of money.

It will be observed from this brief outline of the case that a mass of figures and a mass of evidence has accumulated in the record in this case, on the question of representations as to the amount of timber actually on the land, this being in sharp dispute—and on the earning capacity of the railroad—which we forego undertaking to detail here.

First. The first assignment of error is to the effect that the witness, McCain, offered to show that while West, one of the alleged conspirators, was managing the sawmill plant of the appellant corporation, upon complaint being made to him of the quantity of timber being manufactured into lumber, West claimed that this was free timber, and, upon demand to see whether they had

good timber, they were carried to a place by West, and shown splendid timber, which satisfied Arky and Cochran; but they later discovered that this timber was not embraced within the deal here being inquired into.

The deal was closed in February, 1922. This evidence was offered presumably as tending to establish a conspiracy and the carrying out of such designs on the part of West, in conjunction with Cochran and Rothenberg.

We think the court correctly sustained the objection to this part of the testimony, for the reasons, first, that West was the employee of the appellants, and made the statement while in their employ, long after the fraud had ultimated into a closed and completed contract; second, that there is no complaint in the declaration or evidence as to any representations as to the quality of the timber, and this statement and action of West is strictly confined to the quality of timber, and not to quantity; and, third, there is no sufficient evidence in this case, either direct or circumstantial, to establish that West was connected with any conspiracy; and, if it were not for the other reasons given, the testimony would not be competent of itself and alone to establish the alleged conspiracy, and therefore would not be competent as against the parties to this litigation, who are not shown to have participated in whatever wrong there might have been in West's statements and actions on this occasion.

Second. It is urged that it was error to permit a telegram to be offered in evidence, the same being from Colmer, Green & Company to Cochran, offering Cochran one hundred fifty thousand dollars for his timber.

No possible harm could have come to the appellant because of the introduction of this telegram. Arky, one of the appellants, before its introduction by the appellees, had testified to every material fact in the telegram, and whatever injury there might have been in it appellants themselves put into the record. The telegram was pro-

duced by Arky, though offered in evidence by the appellees.

Third. The main assignment of error in this case is the giving of two instructions by the court on behalf of the appellee, on the question of fraud, as follows:

"The law does not lightly impute fraud or false representations in business matters to any man; but the law is that false representations and deceit must be established by testimony that is clear and convincing, and the burden is upon the plaintiffs in this case to establish to the satisfaction of the jury, by a preponderance of the testimony, and by testimony that is clear and convincing that the defendants made to the plaintiffs representations as an existing fact as to the quantity of timber on the lands; that such representations were, in fact, false; that plaintiffs had a right to rely on such representations, and did rely on such representations. And you are further charged that you are the sole judges of the credibility of the witnesses, and that the term preponderance of testimony does not necessarily mean the greater number of witnesses, nor the greater volume of testimony, for the lesser number of witnesses and the smaller volume of testimony may be of greater weight than the larger number of witnesses and the greater volume of testimony; but the preponderance of the testimony as used in these instructions means that character, kind and quality of testimony which is more persuasive in establishing the truth of the issues involved, than the testimony offered in opposition thereto, and this is true, regardless of how many witnesses or how much testimony has been offered by either side."

Counsel for appellants has very ingeniously assembled the authorities, and made the most of the want of unity and conformity in the many opinions on the subject. But, analyzing his position, he says that the rule ought not to be in this state that the burden of proving deceit and misrepresentation or fraud should require more than a

mere preponderance of the evidence, and that the use of the words ''clear and convincing'' is not proper, because this court has held that fraud may be predicated upon a misstatement of the facts without knowledge of the truth, where the misstatement injures the party to whom it is made, and who acts upon the misstatement, even though it is innocently made.

In the first place, in two counts of their declaration, the charges, in our opinion, amounted, when properly analyzed, to a charge of actual fraud against the appellees, and their proof, instructions, and the weight of their arguments here are to support that contention; and, of course, having secured instructions to that effect, under their own idea of the rule, they cannot complain that the answer to the proposition of actual fraud is made by the defendants that the burden is upon them to establish it by the preponderance of the evidence, ''clear and convincing,'' unless this case should be reversed because of the use of the language ''clear and convincing,'' as to the character and of the evidence in any case where the issue of actual fraud, or not, is submitted to the jury.

Appellants submit authorities from the appellate courts of six states; in Montana the opinion of the court is clearly controlled by the statutory limitations of that state; the Michigan Supreme Court has not adhered strictly to its announcement that a mere preponderance of the evidence is all the burden that is cast upon the complaining party in an action for fraud; and, while the Texas court has held sustaining counsel's contention from one of its appellate courts, the last utterances seem to be in conflict therewith.

Apart from the jurisprudence of our own state, there are many decisions holding that on a charge of fraud the testimony should be ''clear and convincing,'' ''clear and satisfactory,'' ''cogent, clear and satisfactory''—some courts holding that the burden is upon him who alleges fraud to prove it beyond a reasonable doubt.

Counsel for appellees cite us to the law court case of *Railroad Co.* v. *Turnbull*, 71 Miss. 1029, 16 So. 346. This is a case in which a railroad company was sued for damages, and interposed as defense a release secured from the plaintiff, to which defense the plaintiffs set up that the release was procured by a fraud, and in that case the court held that the plaintiff had not established his allegation of fraud by evidence that was "clear, convincing and indubitable," saying that on a charge of fraud this burden was upon him who alleged the fraud.

In the case of *A. & V. R. R. Co.* v. *Kropp*, 129 Miss. 616, 92 So. 691, another law court case where a plea of fraud was interposed, the opinion in the *Turnbull case, supra,* was approved to the extent of using the words "clear and convincing."

In the case of *Choate* v. *Pierce*, 126 Miss. 209, 88 So. 627, this court approved the use of the words "clear preponderance of the evidence."

In two cases before this court, in the instructions on this subject, the words "clear and convincing" were used, and were assigned as error, but were not condemned by this court, although the cases were reversed on other grounds. We refer to the case of *McNeer & Dodd* v. *Norfleet*, 113 Miss. 611, 74 So. 577, Ann. Cas. 1918E 436, and *Hines* v. *Lockhart* (Miss.), 105 So. 449.

There are numerous equity cases in Mississippi where this court has held that one who alleges fraud must prove fraud in the execution, or in procuring the execution, of an instrument, contract, or document—must prove his allegation by "clear and convincing" evidence.

Among this number, on a bill to cancel an instrument, the chancellor was reversed in the case of *Carter* v. *Eastman-Gardner Co.*, 95 Miss. 651, 48 So. 615, and the rule announced that the evidence must be "clear and convincing."

In the equity case of *Christian* v. *Green* (Miss.), 45 So. 425, the court said that clear proof was required in order to prove that the document sought to be overturned was procured by fraud or misrepresentation.

In the equity case of *Locke* v. *Keiler,* 90 Miss. 3, 43 So. 673, this court said:

''We have weighed them in every aspect in which the subject can be viewed, under the *well-settled rule that fraud must not only be proven, but proven clearly and convincingly* [italics ours] and we are driven to the conclusion that the evidence in the record, taken as a whole, fails to meet the rule—fails to satisfy clearly and convincingly that there was such fraud as is alleged. . ., . Fraud is not a thing to be lightly charged, and most emphatically is not a thing to be lightly established.'' etc.

Referring to the proof in the case of *Mohr & Sons* v. *Tate,* 117 Miss. 606, 78 So. 544, the court again said that evidence, where fraud was charged, must show the fraud by ''clear and convincing'' evidence.

We are unable to perceive any reason why there should be any difference in the rule enforced in an equity court as to a charge of fraud and in a law court as to the same character of charge. There are not degrees of fraud, and whether a man wilfully misstates a fact knowingly, or wilfully misstates a fact without any knowledge, the fraud is the same, and the stigma upon him who perpetrates it cannot be differentiated. In the one case, his utterance is a falsehood, knowing the extent of it; in the other he utters a falsehood without knowledge, creating the impression that he has the knowledge, and lets his imagination have full rein—thereby injuring his neighbor.

The truth is that in the earlier decisions in this country a higher degree of proof was required in law courts than was demanded in equity courts, but now the courts generally require the same degree of proof.

Counsel for appellants cited the case of *Doe* v. *Digno-witty,* 4 Smedes & M. 57, where the court had before it an ejectment suit, and one of the defendants in ejectment sought to interpose a deed, and the deed was attacked by the plaintiff in ejectment on the ground that the deed was made between the parties during the incapacity of the grantor, and for the purpose of hindering, delaying, and defrauding creditors, and used this language with reference to the instrument:

"The only other charge we shall notice is in these words—'If the plaintiffs rely on fraud to destroy the deed to Dignowitty, the fraud must be clearly proved.' It is not easy to say precisely what is meant by the words clearly proved. If anything more is intended than that the jury must be satisfied, by the proof of the existence of the fraud, then the instruction is too broad. The plaintiff's testimony must be sufficient to produce belief in the jury that there was fraud in the transaction; this may be done by circumstantial as well as by positive proof. *The law only requires such proof as will convince the jury of the truth of the allegation.*" (Italics ours.)

This case was reversed by the court in this language, which we do not now, after having quoted, fully comprehend. Nor did the court base its reversal upon this instruction alone, but had found other errors in the record.

So, in our own state, there has not been called to our attention a case that has been reversed because of the use of this or similar language; but in both the law and the equity courts the rule has been announced that he who asserts and undertakes to prove fraud must do so by "clear and convincing evidence."

The writer of this opinion does not think the word, "indubitable," as used in the *Turnbull case, supra,* should be approved by the court, as it is too comprehensive and too broad, and would put the requisite evidence to a de-

gree amounting to "beyond a reasonable doubt." But we have not that word before us in the case at bar.

We do not think, in the light of the facts in this case, that it was error to give these instructions, requiring the evidence to be "clear and convincing."

Fourth. The court gave an instruction as follows:

"That if you believe from the evidence in this case that the plaintiff purchased the timber in question upon the basis of the Flynn estimate, and relied, in making the purchase, upon the Flynn estimate as to the quantity of timber on the land, *and not upon any representations made by the defendants as to the quantity of the timber, then it will be your duty to find for the defendants."* (Italics ours.)

Appellants say there was no evidence in this record to sustain the court in giving this instruction. We shall only give our conclusion that the testimony amply warranted the court in giving the instruction and the jury in believing that the Flynn estimate was the thing that brought about the deal.

Counsel overlook the fact that the instruction contains the words, "not upon any representations made by the defendant;" and with that qualification as to the Flynn estimate, if there had been no Flynn estimate in this case, we could not reverse.

However, Judge Cochran testified that on the day before the night when the offer was made in writing in this case he told McCain of the Flynn estimate, which was approximately thirty-two million feet of timber.

When the deed was executed and the cutting contract, which was the final consummation of this deal, the Flynn estimate was made the basis of settlement, and it is interesting to note that terms were made upon the Flynn estimate by Cochran and the appellants, as per the cutting agreement, and that, with this estimate before them, for nearly three years no complaint was made, although the estimate of the many acres of land involved in this trans-

action was made in forty-acre tracts by Flynn. There are many inconsistencies in the estimate of Flynn, but there are just as many in the statements of the other witnesses with reference to the estimate of timber.

Fifth. We do not think there was any error in giving the instruction as to the alleged false representations in regard to the earning capacity of the railroad, and that they would make a fortune, and that they would make one hundred thousand dollars, in the light of the knowledge of all the parties of each other, and of the timber, and of the railroad, and of the fact that these appellants admitted they saw the condition of the railroad and equipment before they made the deal, by an inspection, and knew that the railroad was in bad condition; and immediately upon the consummation of the deal they began to expend thousands of dollars upon this railroad.

The statements of Rothenberg as to these matters were prophecy, and we think that the record demonstrates that Rothenberg had no experience in timber, and had no particular advantage in the knowledge of the situation, from that of appellants; in fact, the latter had the advantage— he had no experience whatever. McCain and all of his associates had experience, to some extent, and they had investigated the proposition. The appellees offered evidence tending to show that the railroad was capable of earning one thousand dollars per month while the mill was running. Appellants only offered evidence showing that the mill lost money as operated by them and by Cochran.

We do not say that the opinion of an expert, or of one who has an advantage in his knowledge of a particular subject or object, may not operate upon the minds of his hearers as being a fact—as, for instance, a chemist as to the effect of chemicals, or a physician as to the condition of the body, or of a druggist as to the value of drugs; but certainly a dry goods merchant, who, so far as this record is concerned, never saw a sawmill, could not have

any advantage of the shrewd banker, invester in real estate and timber and sawmill transactions, associated with a real estate dealer, and also with an experienced sawmill man and timber dealer.

Even if this were true, this record is far from showing the earning capacity of this railroad. There is proof positive that the railroad would, under certain conditions, earn one thousand dollars a month. There was no error in the giving of this instruction as to Rothenberg, even if any case of fraud were made out against him, which we are not called upon to decide.

Sixth. Appellant complains of an instruction to the effect that, if McCain and Arky knew that Rothenberg did not know of the representations, etc., there was no liability.

It is obvious that, when a person is acquainted with the fact that an informant has no knowledge on a given subject, he cannot base a false representation on that statement. Rothenberg gave to Arky and to McCain the sources of his information, and they had the same right to form an opinion on that information as had Rothenberg, with superior knowledge in regard to the given subject, and the superior advantage of ascertaining the truth at the time of the statement, and before it was made, and subsequent thereto, before closing the deal. The instruction could not have influenced the verdict in favor of Rothenberg in this case.

Seventh. Counsel assign as error the refusal of the court to grant him instructions on punitive damages.

It is well settled that in all cases where punitive damages are predicated on actual damages, if no actual damages are allowed, punitive damages are not recoverable, so it is unnecessary for us to discuss this proposition.

In conclusion, we will say that we have given this case much thought, we have carefully read every word of it, we have checked the authorities cited by counsel for ap-

pellants and appellees, and we think the case, considering its magnitude and the amount involved, and the clearness with which the issues were presented to the jury, has been fairly tried; and we do not think that we would be warranted in interfering with the verdict of the jury, where the same is sufficiently supported by the evidence.

*Affirmed.*