NEW YORK LIFE INS. CO. *v.* GILL.

(Division A. June 20, 1938. Suggestion of Error Overruled July 11, 1938.)

[182 So. 109. No. 32920.]

Wilbourn, Miller & Wilbourn, of Meridian, for appellant.

818

820

**Robert M. Holmes** and **Thos. L. Bailey**, both of Meridian, for appellee.

824

Argued orally by **R. E. Wilbourn**, for appellant, and by **Robert M. Holmes**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The appellee, Mrs. Flora L. Gill, brought an action at law against the New York Life Insurance Company upon an insurance policy for $3000 which provided for double indemnity in case of death by accident, as shall hereafter appear. In the declaration she averred the existence of the insurance policy in force at the time of the death of the insured, Morris Vernon Gill, her husband; and that he came to his death by accident within the terms of the policy; and also averred that because the insurer had in its possession the proofs of death, revealing to it the cause thereof, it owed plaintiff thereunder the sum of $6000, and that it had not paid the additional amount of $3000 alleged to be due because of the accidental death of the insured, to her, as beneficiary in the policy.

She further averred that the insurer, its agent Mark, the Long Bell Lumber Company and C. Vandercook, superintendent thereof, together with the physicians, had conspired together to conceal from her the cause of her husband's death, which occurred on the 4th day of September, 1925; and at great length averred concealment, fraud and deceit on the part of the insurer and the other persons named; that she left Crandall, Mississippi, where her husband's death occurred, to accompany his remains to Humboldt, Tennessee, for interment; and that on her return Mark, the agent for the insurer, presented to her a draft drawn by the insurer in her favor for the sum of $3000; and that he then and there fraudulently represented to her that the statements furnished the insurer by the two physicians showed that her husband, the insured, had died of natural causes, and that the face of the policy was all the defendant company was due her; that she relied upon the statement, and had no reason or cause to know that her husband had suffered an accident on the day of his death, and that she did not learn of his death having been caused by an accident until October, 1935. This declaration was filed on August 31st, 1936, nearly

eleven years after the death of the insured. There was much pleading, which it would unduly prolong this opinion to set out in full.

The insurer filed a plea of the general issue, a special plea of the statute of limitations of six years, Code 1930, section 2292, and a plea of accord and satisfaction, with denial of any fraud on its part, or any conspiracy with reference to the matter; and issue was joined on all these pleas by lengthy replications.

Upon trial before a jury, and a verdict thereby, the court below rendered a judgment for $3,000 with interest, from which judgment the New York Life Insurance Company appealed here.

We shall not set forth the many errors assigned as ground for reversal of this cause, as we have reached the conclusion that a peremptory instruction requested by the insurer, and denied by the court, which denial is assigned as error, should have been given. We are of the opinion that the evidence wholly fails to sustain the charge of concealed fraud, and that the appellee exercised no diligence whatever in ascertaining the cause of her husband's death.

As a witness in her own behalf, Mrs. Gill testified that her husband died on September 3rd, 1925, about eight o'clock at night. He had been working that day for the Long Bell Lumber Company, left home that morning to go to his work some distance from Crandall, where he lived with his wife; that he lived only about thirty minutes after he was brought home in a dying condition, where he was attended by Drs. Smith and McRae; that he was well when he left home; she was present with Dr. McRae when he died. She testified that on the night of his death she had the insurance policy involved in this controversy in her possession, in the dresser drawer, that she gave it to someone that night, and had not seen it since.

She testified that Dr. McRae was employed by the

Long Bell Lumber Company as its physician, and was also the family physician of her husband and herself.

C. Vandercook was superintendent of the Long Bell Lumber Company; she saw him at a neighbor's home the night of her husband's death, where he called on her, to ascertain her wishes in regard to the burial of her husband; that on the following day the body of Mr. Gill was carried to Quitman for shipment to Humboldt, Tennessee, Vandercook taking the appellee and her children to Quitman, stopping by the company office to sign some insurance papers before taking the train, which was due about midnight, where in the presence of a notary, Mr. Mark, who had solicited and written the insurance on the life of Gill about a month before his death, a Mr. Mullett, and Vandercook, she signed some papers—what she did not know—being dazed, she did what she was told; that Vandercook told her that Mark was leaving for Washington, and wanted her signature to the papers to save delay. She went to Humboldt, stayed about three weeks, when she returned to her home, where she received the following letter from Mark:

"Dear Mrs. Gill: I just returned from Longview, Washington. Am working on your claim. Will advise you in a few days. Am sorry of the delay but it is taking quite a bit of investigating. Kindest regards to my Crandall.

   "Yours truly,
    "Gust K. Mark."

About a week thereafter Mark called on her with a check for $3,000, at which time the following conversation occurred between them:

"What did Mr. Mark give you, if anything, on the occasion of his visit? A. He gave me this check.

"What did he tell you, if anything, when he gave you the check? A. He told me my husband had died of heart trouble and upon his investigations that that was all they owed me.

"Now, Mrs. Gill, state whether or not you believed what he told you? A. I did."

Upon her return after the funeral she heard no discussion of the cause of her husband's death; but in 1935 a friend told her that he had suffered an accident in the woods on the day of his death—this was the first she heard of his having been injured while at work in the woods; she had thought his death was the result of heart trouble, as both Dr. Smith and Dr. McRae had told her on the night of Gill's death. She remained in Crandall until December 26th, 1925, when she moved to Meridian, and has not since lived in the former community.

Three witnesses were offered, who testified that at about 4:30 on the evening of September 3rd, 1925, the employes of the Long Bell Lumber Company, including Gill were engaged in loading a shaft weighing 800 to 1,000 pounds on a trailer, to be conveyed on the railroad from the woods back to Crandall. The employes were carried to the woods in the morning on a train, and returned to Crandall by the same means at the close of the day's work. They said that Gill was holding a bar or hand stick, with another man on the opposite side, when something caused this man to let his end slide back toward Gill, leaving him to hold the hand stick or load bearer for a short time, until some negroes could run up and assist him; that Gill looked pale, sat down on a log or stump, and would not talk, except to say that he was hurt. Other witnesses for the appellee testified that he was sick on the train, and that on reaching Crandall he was assisted to get off, and then laid down near the track, and employes went for his car and the doctor. He was given a hypodermic by the physician before being removed to his home. He sent word to his wife to send him a gallon of hot salt water, which was done. Dr. Smith administered another hypodermic before he left Gill, and requested Dr. McRae to go to see him, which the latter did. McRae told Gill he was in a bad condition, and should take medicine, which he at first refused

to do, but finally took a dose of digitalis from the doctor's hands, and in a moment or two was dead.

The witnesses who testified to the occurrence in the woods were strongly impeached by evidence showing that they were not in the woods at that point, about ten miles from Crandall, on the date of the incident testified to; other witnesses testified that nothing unusual happened in connection with the loading of the shaft, and that in the forenoon Gill was complaining of a severe headache—said his head felt as though it had been hit with a platter, and complained during the day.

The proofs of death executed by Vandercook and Mrs. Gill, the former in the capacity of a friend, revealed nothing as to the cause of death, simply stating the fact of his death, with other facts which the proof shows to have been obtained from family papers, as to his age, etc. No question concerning the cause of Gill's death was asked either of Vandercook, who swore to the proof as a friend, or of Mrs. Gill, the claimant. She did answer therein replying to a question, that she did not desire to leave the money with the company, but wished it paid in cash.

The sworn proofs of death executed by Drs. Smith and McRae, the attending physicians, were not executed on the night of September 3rd, but were subsequently made out and mailed to the agent, Mark, who in turn mailed them to the Jackson office, which in turn forwarded them to the main office of the New York Life Insurance Company. Mark made out the statement signed and sworn to by Mrs. Gill. In the physicians' statements the following facts are found: That Gill was the master mechanic of the Long Bell Lumber Company, that he was thirty-six years old; that he died at Crandall on the 3rd of September, 1925; and in answer to the question, "What disease was the immediate cause of death?" Dr. Smith answered, "Apoplexy caused by heavy lifting." And to the question, "How long, in your opinion, did deceased suffer from this disease?"

replied, "1 hour." "If death was due to accident give full particulars and date?" to which there was no answer.

Dr. McRae answered these same questions as to the cause of death, "Apoplexy caused from lifting shafting;" that he suffered from the disease one hour, and made no answer as to whether or not the death was due to accident. Both physicians reported in the proofs that he was stricken and died within an hour.

The evidence discloses that Mrs. Gill never saw these proofs of death. Mark, the agent, left the blank proofs on the desk of Dr. McRae on failing to see him, with a note, requesting that he and Dr. Smith fill up the proofs and mail them to him. Dr. McRae testified that he and Dr. Smith agreed to report the cause of death, and had done so, to the insurance company as stated in the application, and said that Mr. Gill had not died from an accident. A certified copy of the report of Dr. McRae as attending physician, and of Dr. Smith as registrar of that district, to the Bureau of Vital Statistics of the State Health Department was offered in evidence, showing that they reported the death of Gill as having been caused by apoplexy; the family history therein was said to have been given them by Mrs. Gill.

The original check for $3,000, which was delivered by Mark to Mrs. Gill, is in evidence, less the premium which was due, making it $2,937.86, under the death clause of the policy; and on it is the notation, "In full settlement of all claims under policy No. 9,144,250." On the front of this policy is the following: "Notice: It is not necessary for the Insured or the Beneficiary to employ the agency of any person in collecting the insurance under this policy, or in receiving any of its benefits. Time and expense will be saved by writing direct to the Home Office, 51 Madison Avenue, Madison Square, New York, N. Y."

The insurance contract issued herein agrees to pay "to Flora L., wife of the insured, $3,000.00 upon receipt

of due proof of the death of Morris V. Gill, the Insured, or $6,000 (double the face of this policy) upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within ninety days after sustaining such injury, subject to all the terms and conditions contained in Section 2 hereof.''

"Section 2—Double Indemnity. The provision for Double Indemnity Benefit on the first page hereof, will not apply if the Insured's death resulted from self-destruction, whether sane or insane; from any violation of law by the Insured; from military or naval service in time of war; from engaging in riot or insurrection; from war or any act incident thereto; from engaging, as a passenger or otherwise, in submarine or aeronautic operations; or directly or indirectly from physical or mental infirmity, illness or disease of any kind. The Company shall have the right and opportunity to examine the body, and to make an autopsy unless prohibited by law.''

The original policy here in evidence was taken up by Mark upon delivery of the company's check to Mrs. Gill, who had it in her possession, as she testifies, at the time of her husband's death; she does not claim that she was unaware of its provisions, nor did she say that she had not read it; nor did she testify that she ever inquired of his fellow employees, of whom there were many, as to the circumstances of Gill's illness. The fact is that this record is totally barren of any evidence of effort on her part to ascertain the cause of the death of her husband, the contents of the proof of death sent in by the physicians to the insurance company; nor did she make inquiry of the Bureau of Vital Statistics in regard to the matter. There is no evidence that the New York Life Insurance Company ever communicated with her in any manner, or that she ever applied to the insurance

company for any information concerning her husband's death.

On behalf of the appellant, a physician, in reply to a hypothetical question, embracing all the material facts connected with and surrounding the death of Gill, gave as his opinion that the insured had not died of apoplexy, but that his death was caused by a dilated heart. Vandercook, the officers of the New York Life Insurance Company, Mark, and Dr. McRae, all denied any collusion, conspiracy or fraud in connection with the matter. Mark specifically denied the statement attributed to him on delivering the policy. Dr. McRae said he would have aided Mrs. Gill in getting all she could from the insurance company. There is no showing that either of the physicians were in any way representing the insurance company when they attended the insured in his last illness, nor that they were in any way required by the insurance company or any agent, to make any statement or to do anything in connection with the matter of Gill's insurance, except the note from Mark requesting that Dr. McRae and Dr. Smith make out the proofs and send them in. Vandercook said that he acted as a friend; he knew that Gill had insurance, and thought the policy was at the office, inquired there; and then Mrs. Gill told him she had no money with which to bury her husband— that she wished to bury him at Humboldt among relatives and friends. He then obtained the policy from her, signed the friend's affidavit as a part of the proof of the claim, in order to facilitate collection of the proceeds of the policy. He had not heard of any accident, was not in Crandall when Gill died. Vandercook, Cole and Mark all testified that when Mrs. Gill signed the papers no advantage was taken of her, but that all were trying to aid her. Vandercook advanced her the money with which to take the trip to Humboldt, and pay the funeral expenses, expecting, of course to be repaid from the proceeds of the insurance policy.

It is undisputed in this record that where death en-

sues from apoplexy the patient is paralyzed in some part of his body. No such symptom appeared in this instance, according to the evidence of the attending physicians. The evidence further discloses, without dispute, that by the contract with the insurer Mark was only a soliciting agent for it, with a right to solicit insurance and deliver the policy to the insured. He explained in his testimony that the investigation made by him, referred to in the note, was because of the fact that the company, upon receipt of proofs had required of him the execution of a statement as to the condition of the health of the insured at the time of the delivery of the policy to him. The response of the agent thereto was to the effect that when the policy was delivered to him the insured appeared to be in perfect health.

Mark further testified, and his testimony is not disputed, that he received the policy at the time he delivered the check of the New York Life Insurance Company to Mrs. Gill.

We are of the opinion that the peremptory instruction requested by the appellant in the court below should have been granted for two reasons; first, all of the evidence shows that this claim was barred by the six-year statute of limitation, unless there was concealed fraud on the part of the New York Insurance Company in keeping from Mrs. Gill knowledge of the cause of action; in which event the cause of action shall be deemed to have accrued at, and not before, the time when such fraud, with reasonable diligence, might have been known or discovered. Section 2312, Code of 1930.

In order for a fraudulent representation to constitute fraud, it must have been made under such circumstances, and be of such nature that a reasonably prudent person would act thereon. Pilot Life Ins. Co. v. Wade, 153 Miss. 874, 121 So. 844. In Jones v. Rogers, 85 Miss. 802, 38 So. 742, this Court held that the complainant must exercise reasonable diligence to discover the fraud sooner, or show that he could not, with rea-

sonable diligence, have discovered it sooner. Also, see, Young v. Cook, 30 Miss. 320, and First Nat. Bank v. Johnson, 177 Miss. 634, 171 So. 11.

It is true that Mrs. Gill did not know that proofs of death showed that the deceased had died of apoplexy caused by heavy lifting. The physicians lived in the same town with her. She testified that they told her that her husband died of heart disease. The only contradiction as to that statement in this record is in the proof of death furnished the insurer, and the report of physicians filed in the public Bureau of Vital Statistics, the latter being prima facie evidence of its contents, and was open and accessible to her during the whole six years. The fellow laborers of Gill on the day of his death were neighbors; and the same avenues of information were open to her as to the physicians, or to the insurer in this case. If any person connected with this case deceived Mrs. Gill, it was the two physicians. There was not the slightest evidence to indicate that either of the physicians entered into any conspiracy with the insurance company, nor is there any proof, direct or implied, that there was any conspiracy on the part of anyone to defraud Mrs. Gill. Upon receipt of the written proof of death, containing no statement of any accident—and these proofs were unquestionably sent to the company by the attending physicians—which would lead the insurer to believe that Mrs. Gill was not acquainted with all the facts stated therein, they were warranted, upon the expert testimony in this case, to believe that Gill had died of disease, or at least they had ground for that assumption.

We have, then, a case where the beneficiary did not know of the statement in regard to the cause of death contained in the proofs, executed solely by her physicians, and where the insurance company had no reason to suspect that the beneficiary was not advised by the physicians of the contents of the proof of death. Mrs.

Gill was in a better position to ascertain the facts than was the insurer; and she did nothing.

It is argued that the statement made by Mark, the agent, together with the proofs of death, lulled Mrs. Gill into accepting Mark's statement that upon investigation her husband was found to have died of heart disease, and that the amount of the check was all the company was due her. She says she believed that statement; and that the two physicians, on the night of her husband's death, had told her it was caused by heart disease.

If we assume, though we do not so decide, that the company, by its general agent, made this assertion on the delivery of the policy, this was nothing more than an assertion on the part of the insurer that the amount tendered was all they owed her; she accepted it, and delivered, or had delivered, to the company the policy of insurance; and for six years she did not inquire, either of the physicians, or of the State Bureau of Vital Statistics, or of her neighbors and friends, in regard to the circumstances of her husband's death. This was not reasonable diligence. Her husband had delivered the policy to her, and she had placed it in the dresser drawer; presumably she knew its contents—she did not disclaim such knowledge. During all these years the information as to the accident to Gill was as readily accessible to Mrs. Gill as to the insurer, and she was not, as we see it, in any manner prevented by anyone from ascertaining the facts now brought to court in this case.

We do not think there is any evidence of fraud on the part of the insurance company, which is sufficient, when submitted to the jury, taking the evidence as a whole, to sustain the verdict in this case. The mere silence of the insurance company as to the contents of the proofs of death in this case, submitted by Mrs. Gill's physicians, so far as she is concerned does not constitute fraud, under the circumstances of the case. It has not been supposed that an insurance company, on receipt of proofs

of death, ostensibly made at the instance of the claimant or beneficiary, would be aware that such claimant or beneficiary did not know the contents thereof. Nor have we been cited to any case in which the insurer was called upon to notify the beneficiary of the contents of the proof of death, unless those proofs were questioned by the latter. We may assume, though we do not so decide, that Mark was the general agent of the insurance company when he delivered the policy, and when he made the statement attributed to him by Mrs. Gill, assuming her evidence to be true, and rejecting Mark's denial thereof, still she knew that Mark was not present when her husband died, although she was; and she also knew that the attending physicians, Drs. Smith and McRae, under the circumstances were the persons to determine the cause of death. Mark's statement to her that her husband died of heart disease was bound to have been only an opinion, in the light of the facts in this case, and she must have known that it was merely a repetition of the statement already made to her by the attending physicians. Proof of fraud must be clear and convincing. McCain v. Cochran, 153 Miss. 237, 120 So. 823.

There is absolutely no proof that either Dr. Smith or Dr. McRae was an agent of the insurance company, or was authorized by it to attend Gill on the night of his death. The only deception in this case, if it can be called such, is the statement of these two physicians in regard to the cause of her husband's death; and it is inconceivable and unreasonable that she would believe the declaration of an agent of the insurance company who was not present, to the exclusion of the declaration of these physicians as to the cause of death.

In reaching this conclusion we have assumed, although we do not so decide, that the evidence was sufficient to go to the jury that the insured came to his death by accident, within the terms of the policy; and that the circumstances tended to show that in lifting the

shafting Gill strained himself; and that this evidence brings the case within the rule announced in U. S. F. & G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605, wherein it was held (page 119) that "a strain received in the ordinary course of the assured's business, if received at all, is an accident within the contemplation of the policy, we can have no doubt. U. S. Mut. Acc. Ass'n v. Barry, 131 U. S. 100, 121, 9 S. Ct. 755, 33 L. Ed. 60, 67."

We conclude that Mrs. Gill, under all the circumstances of this case, did not exercise reasonable or ordinary diligence to discover the cause of her husband's death. The insured died on September 3rd, 1925, and on October 21st, 1925, the beneficiary received and cashed the check for the amount which the insurer claimed to be due, the proofs of death having been received and acted upon by the insurer within these dates. The cause of action on the double indemnity clause of a policy then accrued to her either at the time of the death of the insured, or within a reasonable time thereafter. See 37 C. J., section 311, p. 557; Cooley's Briefs on Insurance (2 Ed.), vol. 7, p. 5915. We are not called on here to say what a reasonable time is, but certainly the six years, the period of limitation, in which she might have brought suit, was more than a reasonable time. About eleven years elapsed from the time of her husband's death, and the bringing of this suit by Mrs. Gill. At all events, the cause of action had then been barred by the six-year statute of limitation, it having been ascertained that there was no concealed fraud on the part of the insurer within the meaning of section 2312, Code of 1930.

Reversed and judgment here for the appellant.