PRESLEY, et al. *v.* AMERICAN GUARANTEE & LIABILITY INSURANCE Co., et al.

No. 41301        December 14, 1959        116 So. 2d 410

*Pyles* & *Tucker*, Jackson, for appellants.

*Henley, Jones & Henley,* Jackson, for appellees.

APPELLANT IN REPLY.

LEE, J.

American Guarantee and Liability Insurance Company and United States Fidelity and Guaranty Company, assignees of all rights, as indemnitors of Deposit Guaranty Bank and Trust Company, in their bill of complaint against J. Douglas Dedeaux, Hugh H. Moore, Sam L. Presley, Jr., and P. D. M. Enterprises, Inc., sought to recover $2,941.69, being the amount of the bank's loss in connection with the payment of a check, drawn by the corporation, and guaranteed by Presley and Moore.

Presley filed both general and special demurrers, which challenged the sufficiency of the alleged cause of action, and, by his answer, denied the material allegations of the bill of complaint. Both P. D. M. Enterprises, Inc., and Moore filed general and special demurrers, and adopted by reference the answer of Sam

L. Presley, Jr. Dedeaux filed no pleading. The demurrers were overruled. At the conclusion of the evidence, the chancellor made a finding of law and fact and adjudged that the defendants were jointly and severally liable. From the decree, which was entered in accordance with the finding, Presley and the corporation appealed.

The controversy arose in this way: Sam Presley, Jr., J. D. Dedeaux and Hugh Moore organized P. D. M. Enterprises, Inc., a corporation, with a capital stock of 30 shares of the par value of $100 each, and issued to each incorporator, upon payment of $1,000, 10 shares of the stock. Their purpose was to purchase an assignment of the lease, together with the personal property, and operate the business known as Cicero's Restaurant, in the City of Jackson. The consideration therefor was $30,000, payable $15,000 in cash and $15,000 secured by a promissory note, payable $400 per month, and bearing interest at the rate of 5 percent per annum.

Each of the incorporators, on September 8, 1956, loaned the corporation $4,000, and took, as security, the corporate note in that amount, with interest at the rate of 5 percent per annum. They also made an other loan of $700 each and took the corporate note therefor with the same interest rate.

The transaction was consummated, and Dedeaux, at a salary of $500 per month, operated the business from September 8, 1956, until January 8, 1957. In the meantime, dissension arose between Dedeaux and Presley. Finally, on a give or take proposition, Presley, with the consent of Moore, acquired Dedeaux' stock and interest, in the name of the corporation, for a consideration of $7,500. In order to raise the money for this purpose, Presley and Moore were each to lend the corporation $3,750, which loans were approved by the minutes of the corporation.

Three checks, with the corporation as maker, drawn on Deposit Guaranty Bank & Trust Company of Jack-

son, were delivered to Dedeaux, as follows: One in the sum of $2,733.11, in payment of Dedeaux' 10 shares of stock; another, in the sum of $710.20, being the amount of the principal and interest on the corporation note of $700 to Dedeaux; and the third, in the amount of $4,-066.69, being the principal and interest on the corporate note of $4,000 to Dedeaux of date of September 8, 1956. This third check was postdated as of January 22, 1957, and on the back was this notation: "Payment fully guaranteed by us as individuals," and signed by Sam L. Presley, Jr., and Hugh H. Moore.

Presley promptly paid the amount of his loan to the corporation, and, from the proceeds thereof, the checks for $2,723.11 and $710.20 were paid. Moore did not put up the money, which he agreed to lend. Consequently when Dedeaux, about January 22, 1957, or soon thereafter, presented the $4,066.69 check to the bank, payment was refused because of insufficient funds. Such refusal was stamped on both the face and the back of the check. At least on one other occasion, and perhaps on others, payment was again refused. Two such refusals were stamped on the back of the check.

Mrs. Marian Dedeaux, 32 years of age, had been married to Dedeaux for 18 months, and they had one child. She had worked in several banks, and had been employed by the Deposit Guaranty Bank & Trust Company for about 10 years. She was having marital trouble, and admitted that in April 1957, she had a conversation with Hugh Moore, in Cicero's Restaurant, in which he told her that no more money was to be paid on the $4,066.69 check. But her husband told her that there was, and she took his word for it. She admitted that her husband had also told her that Sam Presley, Jr., had paid everything that was due and did not owe anything else. She also knew that Sam Presley, Sr., in July 1957, had loaned her husband some money.

Mrs. Dedeaux testified that she and her husband had been separated, but that they had gone back together,

and her husband had told her that he wanted to straighten out and "make a go" of the marriage, and that she also wished to do so; that her husband went to New Orleans, and, on his return, on Wednesday, September 25, he told her that he had gone through Mobile to see Sam Presley, Sr., who had agreed to deposit money to pay the check in order to prevent a suit against Sam Jresley, Jr.; that on Thursday night her husband told her that he had been to a lawyer's office to straighten out the legal ends of the check, and that Mr. Presley "was going to make the deposit Friday morning;" and that he also told her that he had to have the money out of the check. (Actually, Dedeaux had become involved with some New Orleans gamblers who had assaulted him on account of a gambling debt of $2,500, and had threatened to kill him if he did not pay it; and he had told several people about this incident, but he denied that he told his wife. She said that he told her "that he ran into a post in Wiggins, Mississippi, playing baseball.") She further testified, that when her husband came into the bank Friday morning, September 27, 1957, to her as teller and presented the check, "he told me that Mr. Presley had, or either was going to make, the deposit that morning. I would not swear to it because I don't remember which he said. I asked him where the deposit would be made, and he said it would be made probably at one of our branches." She admitted that she looked at the check, saw that it had been turned down on account of insufficient funds, consulted no one, and made no effort to determine whether there were sufficient funds at that time in the P. D. M. Enterprises Inc., account to pay it. She said that she relied on her husband's representations—"I relied on the deposit being made." Thereupon she cashed the check, in the amount of $4,066.69, and gave the money to her husband, who deposited $1,100 to his account, gave her $250 with which to pay the note of $100 on the

house, $100 for her expenses, and $50 to be given to his mother on a debt that he owed her. The balance he put in his pocket, and, as he departed, he said that he would be back by Sunday and they would go to Church. He left, and she did not see him again until sometime the following February.

Dedeaux testified that he told his wife, on the night of September 26, 1957, that he had talked to Sam Presley, Sr.; that this man was going to make a deposit on the check; and that, when he went into the bank the next morning, with his face "in a kind of beat up condition," he told his wife "that the money would be deposited." He admitted that he told his wife that Sam Presley, Sr., was going to make the deposit, but, "I didn't know whether the money was in the bank or not;" and that it was a lie that he told her about the deposit. He admitted that he paid $2,500 of the money to the gamblers. He identified a note dated July 20, 1957, which he had given to Sam Presley, Sr., as evidence of a loan to him in the amount of $2,000, and which was apparently assigned to Sam Presley, Jr. He admitted that he had not claimed that Sam Presley, Jr., owed him anything. (This does not mean that he was exonerating Presley from his guaranty. He knew that Presley had loaned the corporation one-half of the purchase price to be paid, and that, morally speaking, Presley had paid his one-half of the amount of the consideration.)

On the following Monday, the bank discovered that the check had been cashed. The cashier told Mrs. Dedeaux that she did wrong in cashing it, and that she should have referred the matter to an officer. She was discharged on the following Thursday.

The cashier, on October 3, 1957, advised the appellee insurance companies of the loss by reason of the cashing of the check, and that Dedeaux' account of $1,125 was charged with the item, thus reducing the loss to $2,941.69. The insurance companies paid the loss and took an assignment of all the rights of the bank.

Thomas I. Kent, the representative of American Guarantee & Liability Insurance Company, testified that the loss was paid under section (B) of the policy, the "false pretense" section, for the false pretenses, if there were such, on the part of Dedeaux; and that he gave no consideration to the endorsement on the back of the check. Lee G. Kirk, the representative of United States Fidelity & Guaranty Company, testified that the loss was paid under clause (B) because of the false pretenses of Dedeaux, saying that it was made because the bank lost money.

The appellant's argue strenuously that the appellees paid the bank's loss on account of the false pretenses of Dedeaux; that, in fact, there was no false pretense under the law, and certainly none on the part of Presley and Moore; that the bank and its teller knew that P. D. M. Enterprises, Inc., did not have sufficient funds in the bank to pay the check; that there was collusion between Mr. and Mrs. Dedeaux in order to get the money so that Dedeaux could pay his gambling debt; that the bank, in making the payment, was a volunteer; and that the appellants are therefore not liable.

It is true that, on the date that the check was given, the corporation did not have the money to pay it. Dedeaux knew that. Clearly he accepted the check as an acknowledgment of the debt. When, on January 22, 1957, or soon thereafter, he presented it, payment was refused because of insufficient funds, and notice of such insufficiency was stamped across the face and back of the check. When he presented it later, payment was again refused for the same reason, and notice thereof was again stamped on the back. On September 27, 1957, over eight months after the date of the check, it was again presented by him. He then knew that there were not sufficient funds in the bank to pay it. His wife saw that the check itself, from the notations thereon, showed that payment had been twice previously refused be-

cause of insufficient funds. Besides she knew that the money was not then in the bank because Dedeaux told her that Sam Presley, Sr., was going to make a deposit to take care of the check. She made no effort to find out whether such deposit had, in fact, been made at the time. She did not consult a superior. It is almost incredible that Mrs. Dedeaux, after ten years of banking experience, could ignore the cardinal rules of her occupation, heed the request of her husband to cash this particular check on his statement that Sam Presley, Sr., was going to make a deposit to take care of it, and deliver to him $4,066.69 of the bank's money. Yet, that is her story. If true, she is naive indeed.

It is also true that, in a criminal prosecution for obtaining money or other valuable thing under false pretenses, "The pretense must be a representation as to an existing fact or past event, and not as to something to take place in the future; and it must be a representation as to a material fact." 35 C. J. S., False Pretenses, Section 8, page 646; Hammack v. State, 114 Miss. 611, 75 So. 436; McArthur v. Fillingame, 184 Miss. 869, 186 So. 828; Button v. State, 207 Miss. 582, 42 So. 2d 773.

The above principle would have been applicable in a prosecution against Presley and Moore, if they had been jointly indicted with Dedeaux for obtaining the money from the bank under false pretenses. But the fact remains that they, in no way, colluded or conspired with Dedeaux. They had nothing whatever to do with his obtaining the money from the bank and the way and manner in which he did so. See McCain v. Cochran, 153 Miss. 237, 120 So. 823.

On the other hand, the appellees contend that the check was a valid negotiable instrument, issued for a good and valid consideration, namely, the purchase price pro tanto of Dedeaux' interest in the corporation; that P. D. M. Enterprises, Inc., was clearly liable thereon; that Moore and Presley were liable as guarantors, and

that notice of dishonor was not required; that, under the law of subrogation, they are entitled to recover against all of the appellants; and that, while the court was justified in holding all of the appellants to be guilty of fraud, this was not necessary as the liability of the appellants is based on a contract.

■■ The check was clearly a part of the consideration for the purchase of Dedeaux' interest in the corporation. Under Sections 167 and 226, Code of 1942 Rec., it was a bill of exchange; and, under Section 42 of the Code, it was negotiable. Of course it had to be presented for payment within a reasonable time. Section 227, Code of 1942 Rec.

The check was postdated at the time when Dedeaux received it, and he, of course, was apprised of the fact that the corporation did not have funds in the bank to pay it. However, it constituted an acknowledgement of the debt, and was not invalid. Section 53, Code of 1942 Rec. Obviously Dedeaux had the right, upon its nonpayment, to sue either upon the check itself or the original consideration. 8 Am. Jur., Bills and Notes, Section 523, page 238. Compare Parrish v. Feldman, 182 Miss. 77, 180 So. 610.

■■ While payment of the check was refused on several occasions because of insufficient funds, Presley and Moore at no time ever stopped payment on it. There was no plea of payment, and it had not been paid. Sam Presley, although present, did not testify. By reason of their stated endorsement on the back they were guarantors. 10 C. J. S., Bills and Notes, Section 39b, page 470; 38 C. J. S., Guaranty, Section 18b, page 1157.

■■ The guaranty inured to the benefit of a subsequent holder. ■■ In 38 C. J. S., Guaranty, Section 42b, page 1189, it is said: ''Where a guaranty is written or indorsed on a negotiable bill or note, it is negotiable in the sense that it inures to the benefit of successive holders of the bill or note. According to some decisions,

a guaranty indorsed on a note which is general and unrestricted in its terms passes by assignment and delivery of the note to a subseuent bona fide holder thereof, although nothing is said touching the guaranty, and although he was ignorant of the guaranty at the time of his purchase." See also Baker v. Kelly, 41 Miss. 696; Holmes v. Preston, 71 Miss. 541, 14 So. 455; Quinn v. Alexander, 125 Miss. 690, 88 So. 170.

■■■ Of course both the bank and its assignees, the appellees, took the check, subject to such defenses as might have been offered against it in the hands of Dedeaux. See 38 C. J. S., Guaranty, Section 42b, page 1189, where it is said in part: "So the assignee takes the guaranty subject to all the defenses which might have been interposed against it in the hands of the assignor."

The witness Moore, in justification of his failure to make his loan of $3,750 to the corporation, testified that he had a secret agreement whereby Dedeaux would hold the check and keep an interest in the business, unknown to Presley. But the chancellor, in his finding of facts, said that he had observed the demeanor of this witness, and, in his opinion, there was not a word of truth in his statement.

It is true also that Dedeaux, during cross-examination, identified a note, dated July 20, 1957, which he had made to Sam Presley, Sr., for a loan of $2,000, and which was apparently assigned to Sam Presley, Jr. While this note was admitted in evidence with the right to substitute a photostatic copy, the copy was not furnished; and because "the original had been returned to his client" with the consent of counsel, this exhibit was not attached. Thus the due date of the note, and whether it was still owned by Sam Presley, Jr., does not appear in the record.

Obviously no sufficient defense against the check or its guaranty was pled or proved.

■■ When the appellees paid the bank's loss, by the doctrine of subrogation, they were vested with all of the rights of the bank against the named defendants. This principle has aptly been said to be "a creature of equity, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in equity and good conscience, ought to pay it." Oxford Production Credit Assn. v. Bank of Oxford, 196 Miss. 50, 16 So. 2d 384, and authorities there cited.

■■ The bank, in its payment of the check, was not a volunteer. A voluntary payment is the payment of a demand, which the payor does not owe and which is not enforceable against him, without any agreement at the time that any excess will be repaid, and without compulsion or fraud or any mistake of fact, instead of invoking the applicable legal defenses. McLean v. Love, 172 Miss. 168, 157 So. 361. ■■ Conceding that the teller's act, in paying out the bank's money under the circumstances, was utterly inexcusable, the fact remains that the liability of the appellants to Dedeaux, to the extent of the amount adjudged by the decree, was discharged out of the funds of the bank. Manifestly the denial to the bank or its indemnitors of their right to recover for the amount of the appellants' liability, which they extinguished, would be contrary to equity and good conscience. Robertson v. Sullivan, 102 Miss. 581, 59 So. 846, and authorities there cited.

In view of the conclusion here reached, it is unnecessary to deal with the appellants' other contentions as, in the present situation, they have ceased to have any direct bearing on the applicable principles of the case.

■■ The appellees prosecuted a cross-appeal, contending that they are entitled to interest from January 22, 1957, the date of the check, whereas interest was allowed at the rate of 6 percent from the date of the decree. They cite Burton v. Eureka Bank, 84 So. 247. But the action in that case was based on a note, which

provided for interest at the rate of 8 percent per annum. The action in the present case is based on a check, which contains no provision for interest. Consequently Section 39, Code of 1942 Rec., governs, and interest can be allowed only from the date of the decree.

It therefore follows that the cause must be affirmed on both direct and cross appeals.

Affirmed on both direct and cross appeals.

*Roberds, P. J.,* and *Kyle, Arrington* and *Gillespie, JJ.,* concur.