**MOBILE TELECOMMUNICATION TECHNOLOGIES CORP.,**
Plaintiff,

v.

**AETNA CASUALTY AND SURETY COMPANY, a wholly-owned subsidiary of Aetna Life and Casualty Company,** Defendant.

**Civil Action No. 3:96CV685LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 18, 1997.

John G. Corlew, John L. Low, IV, Watkins & Eager, Jackson, MS, for Plaintiff.

Michael B. Wallace, Phelps Dunbar, Jackson, MS; Walker W. Jones, III, Baker, Donelson, Bearman & Caldwell, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on the motion of plaintiff Mobile Telecommunication Technologies Corp. (Mtel) to dismiss the counterclaim filed by defendant Aetna Casualty and Surety Company (Aetna). Aetna has responded to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that Mtel's motion is well taken and should be granted.

Following a dramatic drop in Mtel's stock price on January 5, 1994 on the heels of Mtel's announcement of a substantial cut in its prices for nationwide paging service and expected operating losses for 1994 and 1995, a number of Mtel shareholders filed securities fraud lawsuits against Mtel, its chairman and chief executive officer, its chief financial officer and its executive vice president. Those suits were consolidated, and a consolidated class action complaint alleging securities fraud was then filed against Mtel. In December 1995, this court dismissed the complaint on Mtel's motion. The plaintiffs noticed an appeal, but withdrew it immediately.

In that securities litigation, Mtel was represented by the Washington D.C. office of the Jones, Day, Reavis & Pogue (Jones, Day) law firm. For its work in the case, the firm billed Mtel for legal fees and expenses totaling a shocking $1,916,012.45. Mtel paid Jones, Day, and in January 1996, demanded payment of these fees, less a $250,000 deductible, from Aetna, which provided insurance coverage to Mtel for securities fraud lawsuits, including defense expenses, under an "Insured Persons and Company Reimbursement Policy" (commonly called a Directors and Officers policy).[1] While disputing the amount properly payable for Mtel's defense of the suit against it, in what Aetna characterizes as an "effort to resolve Mtel's claim for reimbursement of defense costs," Aetna paid Mtel $1,000,000 on March 12, 1996, but reserved the right to seek reimbursement for amounts that were determined not to be properly subject to reimbursement under the policy.[2] Thereafter, in September 1996, Mtel filed suit against Aetna seeking to recover from Aetna the balance of the defense expenses it had demanded and which it contended remained due. In its answer, Aetna not only denied that it owed additional monies to Mtel, but it counterclaimed to re-

---

1. As Mtel points out, the policy did not require Aetna to provide Mtel with a defense, but rather provided that Aetna would reimburse Mtel for "losses" and "defense expenses" incurred by Mtel resulting from any covered claim. The policy defined "defense expenses" as "reasonable and necessary legal fees and expenses incurred in defense of Claims; provided, however, defense expenses shall not include salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the Company or any amounts incurred in defense of any Claim where any insurer has a duty to defend."

2. In connection with this payment, Aetna stated to Mtel:

"It is not Aetna's position that its $1 million payment constitutes an accord and satisfaction of Mtel's claim in connection with the Mtel Securities Litigation. As our letter of March 5, 1996 makes clear, however, to the extent that Mtel disputes that the $1 million payment satisfies Aetna'[s] obligations, Aetna reserves the right to recover from Mtel any portion of the $1 million subject to reimbursement under the Policy."

cover an unspecified portion of the $1,000,000 it had paid on the basis that it had paid more than was properly due and owing under the policy. Mtel has moved to dismiss Aethers counterclaim on the basis that "Aetna was, in the contemplation of the law, a volunteer when it paid $1,000,000 in partial satisfaction of Mtel's $1.6 million claim." In response, Aetna asserts that the volunteer doctrine, which generally precludes recoupment of monies voluntarily paid, is inapplicable in this case because it paid the $1,000,000 under coercion and/or duress, and based on a mistake of fact.

Explaining the volunteer doctrine, the Mississippi Supreme Court in *McLean v. Love*, 172 Miss. 168, 157 So. 361, 362 (1934), stated:

It is the general rule in this state, as elsewhere, that a voluntary payment within the meaning of the rule is a payment made, without compulsion or fraud, and without any mistake of fact, of a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand, and when there has been no agreement between the parties at the time of payment, that any excess will be repaid....

. . .

There is no hardship in the rule in regard to voluntary payment; on the contrary, its foundation rests among the fundamentals of judicial procedure.... [I]t precludes the Court being occupied in undoing the arrangements of parties, which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and abilities.... [W]here an unjust demand has been made upon a party, a demand for a debt which he does not owe, or for more than he owes, he must, when he known or ought to know the facts, avail [himself] of the means which the law affords him to resist the demand, and if he do not, and make the payment demanded, he has not taken due care.

See also *Presley v. American Guarantee & Liability Ins. Co.*, 237 Miss. 807, 116 So.2d 410, 416 (1959).

As indicated, Aetna asserts that its payment of $1,000,000 to Mtel is excepted from the volunteer doctrine because it paid that amount "under duress and/or as a result of a mistake of fact regarding the amount actually due and owing to Mtel." It alleges that at the time it made the payment, it did not know and *had no way of determining* the amount of fees and expenses that were properly payable under its policy, and merely succumbed to Mtel's demand for payment because of "unwarranted threats" by Mtel. According to Aetna, Jones, Day's billing statements "provided only a generic and partial description of the services for which fees were charged," cryptically referring to "research," "review of materials," or "interview witness." It submits that the statements thus "failed to contain sufficient detail or information to permit Aetna to make a determination of the reasonableness of the fees," which prompted Aetna to seek additional explanation and information relating to the statements. But throughout the pendency of the securities litigation and even after the case was fully and finally dismissed with prejudice, "Mtel refused to provide Aetna with additional detail or description regarding the daily time entries, allegedly on the grounds that it could not do so without jeopardizing its attorney-client privilege." Additionally, Aetna states that whereas Mtel had demanded payment of over $100,000 in fees and expenses alleged to be attributable to Mtel's efforts to have Aetna fulfill its contractual obligations, Mtel "failed to provide any documentation relating to these fees and expenses." Yet in spite of Mtel's failure to furnish information that would have enabled Aetna to determine its liability for the Jones, Day fees and expenses, Mtel demanded payment and threatened to hold Aetna liable for interest which Mtel would incur were it required to secure short-term financing to meet its cash needs.

Aetna maintains based on these facts that while on the one hand, it know that some amount of fees and expenses had been reasonably and necessarily incurred in defending Mtel and thus would be owing under its policy, on the other hand, it could not determine the amounts properly owing because of Mtel's obstructionist conduct. And, since "no

legal remedy was readily available to Aetna by which the proper amount of reasonable legal fees and costs could be determined expeditiously enough to permit payment of the proper amount before Mtel incurred further costs due to its professed need to borrow funds," it had no reasonable alternative other than to estimate as best it could the amount properly owing and to pay that amount, reserving its rights to recover any amount which it overpaid.

In the court's opinion, Aetna's claim of coercion and/or duress as a basis for avoiding the volunteer rule is not well founded. As a latter of law, the facts alleged by Aetna do not constitute duress or coercion so as to relieve Aetna of the legal consequences of its payment to Mtel. Mtel's threat that it would seek to hold Aetna liable for any interest it might incur if it had to obtain short-term financing to meet its cash needs following its payment of Jones, Day's charges can only be viewed as a "threat" to sue Mtel for consequential damages stemming from an alleged breach of insurance contract. "It is well-established that it is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declarethat he intends to use the courts wherein to insist upon what he believes to be his legal rights." *McGehee v. McGehee*, 227 Miss. 170, 85 So.2d 799, 804 (1956); *see also Kelso v. McGowan*, 604 So.2d 726, 732 (Miss. 1992).

Similarly unsupportable is Aetna's contention that its payment was not "voluntary" because it was attended by a "mistake of fact regarding the amount actually due and owing to Mtel." It was mistaken, Aetna says, because Mtel had withheld material information which prevented it from determining whether the amount it had demanded "accurately reflected the amounts properly due and owing." It is a fact, however, and undisputed by Aetna, that at the time it made the payment, Aetna was well aware that it was not possessed of sufficient information to allow it to determine how much it owed Mtel. In this respect, this case resembles *Armco, Inc. v. Southern Rock, Inc.*, 696 F.2d 410 (5th Cir.1983), wherein Armco, a pipe manufacturer, sought to recover monies it had paid for sewer repairs at a time when the cause of the damage was undetermined.

The court, finding that Armco could not recover the payments, stated:

When the majority of the payments were made, Armco did not know the real cause of the leaky pipes. Armco officials suspected their pipe might be at fault; they also suspected that poor installation was the cause. Additionally, more importantly, the officials knew they didn't know what the real cause was and that a final conclusion would have to await the test results.

The dispute in this case lies with the application of the volunteer rule—specifically the mistake of fact exception—to these facts. Armco contends that its lack of awareness of all the relevant facts is a mistake of fact under the *McDaniel [Bros. Const. Co. v. Burk–Hallman Co.*, 253 Miss. 417, 175 So.2d 603 (1965)] rule. Lester and Southern Rock answer that Armco may have been ignorant, but it made no mistake. This case boils down to one question: Did Armco's ignorance of some of the facts amount to a mistake of fact?

696 F.2d at 413. To answer this question, the court looked to contract law and specifically, the Restatement (Second) of Contracts § 153 and § 154 which, respectively, allow a party to avoid a contract based on a material mistake if he does not bear the risk of a mistake, and which place the risk of a mistake on a party who

is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient.

Comment c to § 154 explains this principle: c. *Conscious ignorance.* Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake were made was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but "conscious ignorance."

*Id.* The court concluded that the volunteer rule was properly applied because "Armco's

officials were consciously ignorant of the facts necessary to a determination of who was liable for the sewer repairs [y]et ... undertook voluntarily to finance them. Under these circumstances there was no mistake. *See Hunt v. Davis*, 208 Miss. 710, 45 So.2d 350 (1950) (the mistake of fact doctrine operates only where the party could not have ascertained the real facts by reasonable diligence)." *Id.* at 413. In this case, Aetna appears to suggest that because its ignorance of the facts was attributable to Mtel's withholding of material information, the "conscious ignorance" rule set forth in *Armco* is inapplicable. The court finds no support for this position. In the court's view, uncertainty about the facts, irrespective of the reason for such uncertainty, is not the equivalent of a mistake of fact. *Cf. Armco*, 696 F.2d at 413. Like the Armco officials, Aetna "may have been ignorant, but it made no mistake." *Id.*[3]

In summary, no one forced Aetna to pay the money in question and Aetna did not pay the money based on a mistake of fact. There was a legal remedy available to Aetna in the form of a declaratory judgment action by which it might have sought an adjudication of

the proper amount of reasonable legal fees and costs.[4] Yet it elected to pay the money rather than pursue that available avenue of relief. Under these circumstances, it is barred by the volunteer doctrine from recovery of any part of the $1,000,000 paid to Mtel and its counterclaim will be dismissed.

Accordingly, it is ordered that Mtel's motion to dismiss the amended counterclaim is granted.

---

**3.** Aetna attempts to distinguish a number of cases cited by Mtel in which the volunteer rule was applied to bar recovery, on the ground that the payors in those cases paid out money that they knew was not owed whereas Aetna paid money when it was unsure what it owed. *See McLean v. Love*, 172 Miss. 168, 157 So. 361, 362 (1934); *Rowe v. Union Central Life Ins. Co.*, 194 Miss. 328, 12 So.2d 431, 434 (1943). In the court's opinion, however, assuming this is a factually valid distinction, it is a distinction without a difference in terms of applying the volunteer rule, for Aetna, by paying money when it did know how much was owed, and when it knew that it was unsure what was owed, was "consciously ignorant" as described by the court in *Armco*.

**4.** As support for its position with respect to its counterclaim, Aetna has cited cases in which insurance companies have been permitted to seek recovery of costs or payments made to or on behalf of their insureds. *See Canal Ins. Co. v. First Gen. Ins. Co.*, 889 F.2d 604 (5th Cir.1989) (insurer which assumed its insured's defense believing that it might be found liable to do so under its policy was not barred by volunteer rule from seeking recovery of defense costs from excess insurer when it was ultimately determined

that insurer's policy imposed no defense obligation); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 447 (5th Cir. 1991) (insurer held not to be volunteer in settling on behalf of insured in absence of an intention on the part of the payor to waive his rights); *Interstate Fire & Cas. Co. v. Pacific Indem. Co.*, 568 F.Supp. 633, 638–39 (D.Md.1983) (excess insurer which was "economically compelled to advance money" in settlement of claim against its insured was entitled to recover those monies from primary carrier, which had wrongly refused to pay claim). In the court's opinion, the situations presented in *Canal Insurance* and *Interstate Fire* are simply not analogous to that here presented. Moreover, Mississippi law, unlike the Texas law upon which the court relied in *Arkwright–Boston*, recognizes the applicability of the volunteer rule even where the payor has attempted to reserve her rights to recover monies paid under protest. *Rowe v. Union Central Life Ins. Co.*, 194 Miss. 328, 12 So.2d 431, 433 (1943) (where payment was not made under coercion, duress or compulsion and was not induced by fraud, then payment was voluntary even though payor made clear that the money was "being paid under protest and without waiving any rights that [she] may have [had] to recover the same").